# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA



**SCOTT L. HEAGNEY**, §
§
███████, TX ████ §
    *Plaintiff* §
§
v. §   Civil Action No. <u>1:24-cv-2592</u>
§
**MERRICK GARLAND, ATTORNEY** §
**GENERAL, U.S. DEPT. OF JUSTICE,** §
950 Pennsylvania Ave., NW, §
Washington, DC 20530 §
    *Defendant* §

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Scott Heagney worked for ATF/DOJ as a Special Agent, then Group Supervisor. In 2021, he gave notice he planned to retire February 21, 2022. In a January 2022 letter, the ATF Acting Director wrote to Heagney in praise of his accomplishments, such as receipt of an ATF Distinguished Service Medal. The Director added a handwritten note, *"Thank you for 20 years of dedicated service to the Bureau…"*

Yet, eight months post-retirement, in October 2022, ATF notified Heagney it planned to make a permanent adverse notation to his file over his supervision *four years earlier* (October 2018) of an operation to recover another agent's stolen gun.

5 U.S.C. § 3322 allows for such a notation <u>if</u> an employee departs while subject of an ongoing Office of Inspector General "personnel investigation." But it doesn't authorize that as to investigations by an internal affairs unit. Here, DOJ OIG completed its investigation over the 2018 events in November 2021, some three months *before* Plaintiff retired, so it was illegal to apply § 3322 to him. ATF's actions don't make sense until one learns Heagney had an EEO reprisal claim and related 2022 lawsuit pending against ATF.

## JURISDICTION AND ADMINISTRATIVE EXHAUSTION[1]

1.     This Court has jurisdiction for reasons such as that:

    1.1.     Defendant is a federal official (28 U.S.C. § 1391(e)(1)).

    1.2.     Plaintiff raises federal questions (28 U.S.C. § 1331), such as claims arising under Title VII (e.g., 42 U.S.C. § 2000e-16) and seeking interpretation of 5 U.S.C. § 3322 (separation prior to resolution of personnel investigation).

    1.3.     Title VII authorizes suits by federal employees under procedures applicable to the private sector (42 U.S.C. § 2000e-16(d)).

    1.4.     A plaintiff may bring a mixed-case lawsuit in federal district court under the authority of 5 U.S.C. § 7702(e)(1)(b) and 29 C.F.R. § 1614.310(h) any time once 120 days have passed since an initial appeal filing with the U.S. Merit Systems Protection Board (MSPB), so long as no judicially reviewable action was issued by MSPB in the meantime.[2]

    1.5.     Plaintiff exhausted his administrative remedies. For example:

        1.5.1.     He appealed to the Merit Systems Protection Board over an action for which an appeal to MSPB is authorized by law. *See* 5 U.S.C. § 3322(c) (authorizing MSPB appeal over a permanent notation to file, under application of 5 U.S.C. § 7701(a)).

---

[1] Assertions in today's pleading are raised in addition and in the alternative to each other.

[2] A "mixed case" is one in which a federal employee challenges an action that is appealable to the MSPB (e.g., a demotion) and concurrently raises a claim under Title VII or other discrimination law. *See Perry v. Merit Sys. Prot. Bd.,* 582 U.S. 420, 420 (2017). It's a "mixed case complaint" if started with EEOC or "mixed case appeal" if started at MSPB.

1.5.2.  That MSPB appeal had been filed July 12, 2023, as compared to the notation to file decision's being issued June 14, 2023.

1.5.3.  The MSPB appeal has not resulted in a judicially reviewable decision in the more than 120 days that have passed since its original filing.[3]

**VENUE AND OTHER PRELIMINARY MATTERS**

2.      Per 42 U.S.C. § 2000e-5(f)(3), venue is appropriate in the federal district court for the District of Columbia for reasons such as it is the district in which the unlawful employment practice is alleged to have occurred and is where the employment records relevant to the practice are maintained and administered. For example:

2.1.    The internal routing ("Investigation Referral Memorandum") by which ATF shared the DOI OIG Report of Investigation (ROI) among its staff members reflects an ATF address in Washington, DC, zip code 20226.

2.2.    The ATF Professional Review Board's notice of proposed notation to file dated October 24, 2022 likewise shows a Washington, DC 20226 address.

2.3.    The ATF Bureau Deciding Official's notice of "Adverse Finding Resulting from a Personnel Investigation under 5 U.S.C. § 3322" does as well.

2.4.    The MSPB case was being heard before its Washington Regional Office (docket number DC-3322-23-0598-I-1, then DC-3322-23-0598-I-2).

3.      In summary, Plaintiff complied with all conditions precedent to bringing this suit.

---

[3] Plaintiff calculates that—as of September 4, 2024—it had been some 420 days since the initial MSPB appeal filing of July 12, 2023. Even if subtracting for periods of administrative dismissals (which Plaintiff calculates to total about 165 days), that is still some 255 days on the docket as compared to the 5 U.S.C. § 7702(e)(1)(B) required waiting period of at least 120 days before going to district court. Plaintiff is not suggesting the 165 days off-docket were improper: they were for typical reasons (e.g., mediation, completion of discovery, witness unavailability) and sometimes at Plaintiff's request. But under any reasonable calculation, the statutory 120-day mark is well in the past.

4.       Plaintiff also mitigated his damages to at least the extent required by law.

## PARTIES AND SERVICE

5.       Defendant Merrick Garland is sued in his official capacity as the Attorney General, heading the executive department (DOJ) of which ATF is a component. For purposes of the MSPB aspects of this suit, he also stands in the shoes of DOJ/ATF.[4]

   5.1.     He is being served by certified U.S. Mail to: The Hon. Merrick Garland/Attorney General/U.S. Department of Justice/950 Pennsylvania Ave., NW/Washington, DC 20530.

      5.1.1.   With copies to:

         5.1.1.1.     Assistant Attorney General for Administration/U.S. Department of Justice/Justice Management Division/950 Pennsylvania Ave., NW/Room 1111/Washington, DC 20530.

         5.1.1.2.     Civil Process Clerk/U.S. Attorney for the District of Columbia/by email to USADC.ServiceCivil@usdoj.gov and certified U.S. Mail to Civil Process Clerk/U.S. Attorney's Office for D.C./601 D Street, NW/ Washington, DC 20530.

      5.1.2.   With courtesy copy to ATF Office of Chief Counsel, via attorney Katherine Bolton (katherine.bolton@atf.gov), by way of filing in the MSPB e-appeal system of notice to ATF and the Administrative Judge, requesting dismissal in light of the present court complaint.

---

[4] ATF's formal name is "Bureau of Alcohol, Tobacco, Firearms and Explosives." MSPB is not named as a party because it has not issued a decision being challenged in this suit.

6.      Plaintiff Heagney resides in the Eastern District of Texas. (His address is partially redacted in the caption as he still works in law enforcement. His full address will be provided to Defendant or they may have it from his being a retired employee.)

7.      Plaintiff was an "employee" under terms of 5 U.S.C. § 3322 and 5 U.S.C. § 7702 in that he was employed by ATF/DOJ before retiring from that federal employment.

## SUMMARY OF LEGAL CONTEXT

8.      5 U.S.C. § 3322 was designed to prevent federal employees from thwarting an investigation and the consequences of it, such as through the employee's retiring just before an OIG interview or just after disciplinary adverse action was proposed.

9.      This law authorizes an agency to propose a permanent notation to the person's personnel records where the individual had been the subject of a "personnel investigation" and departed prior to the "resolution of such investigation."

10.     The statute defines "personnel investigation" to mean two things:

    10.1.   an adverse action (e.g., an unpaid suspension that was proposed but wasn't yet decided at the time of the employee's departure); or

    10.2.   "an investigation by an Inspector General."

11.     This law makes no reference to granting an agency the authority to make a permanent notation to file due to an unresolved investigation by an agency's internal affairs investigators (versus allowing such as to an OIG investigation).

12.     The Inspector General Act created OIGs within agencies for reasons such as to provide "'independent and objective units...to conduct and supervise audits and investigations relating to the programs and operations of' such agencies."[5]

---

[5] *Adair v. Rose L. Firm*, 867 F. Supp. 1111, 1115 (D.D.C. 1994) (quoting the Act at § 2).

12.1.   An "Inspector General's seniors within the agency may not 'prevent or prohibit' the Inspector General from initiating or conducting any audit or investigation."[6]

12.2.   In other words, an Inspector General's office is intended to operate free of undue influence from the agency which it was created to investigate.

12.2.1. This helps explain why Congress included OIG investigations within § 3322, but did not extend that coverage to internal affairs inquiries.

13.   After a notation to file decision is issued, the subject may appeal that to the MSPB.[7]

14.   Title VII, at 42 U.S.C. § 2000e-16(a), requires actions affecting federal employees to be "free from any discrimination" based on protected characteristics.

15.   Title VII has been held to prohibit related retaliation against federal employees, where the challenged action is substantial enough that it might dissuade a reasonable employee from engaging in, or supporting another's, EEO activity.

16.   One way of demonstrating a prima facie case of Title VII reprisal is for a plaintiff to show that the plaintiff engaged in protected activity, then suffered an adverse action, and that there was a causal relationship between the two activities.

17.   In response to an employee's prima facie claim of retaliation, an employer may respond by describing how it acted based on legitimate, non-retaliatory, grounds.

18.   The employee may then reply by showing the employer's stated justification is false, serving as pretext for actions that actually were motivated by reprisal.

---

[6] *NASA v. Fed. Lab. Rels. Auth.,* 527 U.S. 229, 239 (1999) (quoting the Act).

[7] *See* 5 U.S.C. §§ 3322(c) and 7701; *see also* 29 CFR § 1614.302 (MSPB mixed appeal rules allowing a claim to be raised to the Board that an action that otherwise is appealable to it was motivated by prohibited EEO discrimination).

19.  Among the grounds for challenging an agency action before MSPB are that there was harmful procedural error, or it wasn't in accordance with law, or it constituted a prohibited personnel practice (e.g., was motivated by discrimination or reprisal).

## SUMMARY OF FACTUAL CONTEXT

### Plaintiff Was Well-Regarded in the Period for Which Investigated

20.  At least prior to his EEO activity in support of a female Special Agent's discrimination/reprisal claims, Group Supervisor/Senior Special Agent Heagney was considered by management to be a high performer, even in periods overlapping the October 2018 investigation ATF is now alleging he mishandled.

21.  For example:

21.1.  Around July 8, 2018, Special Agent in Charge (SAC) Jeff Boshek [head of the ATF Dallas Field Division] gave Plaintiff Heagney a temporary promotion to serve in the role of acting Assistant SAC (ASAC).

21.2.  Around August 15, 2018, the group of agents that Plaintiff Heagney supervised received an award for superior performance.

21.3.  Around September 30, 2018, SSA Heagney received an annual evaluation with comments from SAC Boshek including this: "Scott, It's been a pleasure working with you this year. Thanks for working so hard to get your group to that 'next level.'"

21.3.1. Among management comments in the Overall Summary section for that evaluation were:

I appreciate the energy you have put toward your group. You have improved the productivity and complexity of investigative work. You have given newer agents developmental opportunities. You supported the mission...

Thank you for your all your efforts, I hope you can continue with it this year.

21.4.   Around May 26, 2019, SSA Heagney received from management a discretionary within-grade pay increase, which is consistent with satisfactory performance.

21.5.   Around November 12, 2019, SSA Heagney received another annual review, with an overall rating of six out of a possible seven points.

   21.5.1. Among the immediate supervisor's comments were:

      21.5.1.1.      "Scott is a good team member and works well in a collaborative environment."

      21.5.1.2.      "Scott is tactful and diplomatic, even in challenging or stressful situations."

      21.5.1.3.      "Scott's group covers a large area and he is effectively balancing conflicting duties. His people are positive and upbeat. The morale in his group is high because of Scott's leadership."

      21.5.1.4.      "I have enjoyed working with Scott this past year and look forward to watching the investigations in Scott's group this next FY. Scott please keep up the great work this next year!"

21.6.   The Midyear Progress Review included supervisor comments that SSA Heagney should "continue to inspire your agents" and about how "[t]hey respect you and want to work for you."

21.7.   Among SAC Boshek's comments in that annual review were:

> Thanks for all of your hard work this past year.
> With the change in focus and AOR [Area of Responsibility],
> your group has really excelled.
> It's been fun to watch as your agents have taken your lead and
> developed some great cases. Looking forward to a great FY20.

21.8.   Among the remarks in the Overall Summary for that FY2019 review were that "Scott is a strong leader and has the loyalty of his group" of agents and that morale was high in his group because of his leadership.

21.9.   The Summary concluded with "Scott please keep up the great work this next year!"

21.10.  It was not only management that held SSA Heagney in high regard, as reflected by later input from his colleagues (in their individual capacities):

21.10.1.    One ATF Special Agent (S.D.) remarked on always having a "great appreciation for [SSA Scott Heagney's] straight forwardness and leadership of both young and experienced agents."

21.10.2.    An agent (J.M.) who had worked for SSA Heagney commented that:

> Scott has always been extremely trustworthy and conscientious. During the time I worked for him I never once felt he put me at risk. In fact it was the opposite. Unlike other supervisors Scott always came out to participate on operations. Scott always showed a great deal of integrity in everything he did. You cannot say the same for other ATF managers.

21.10.3.    An ATF (A.W.) agent who had worked for Plaintiff described him as "one of the best supervisors I have had at ATF."

21.10.4.    Another agent (A.S.) who had reported to SSA Heagney found him to be "one of best leaders I know. Leads from the front and looks out for his people."

21.10.5.    An ATF agent (D.W.) who had work for Plaintiff observed, "Great boss!"

21.10.6.    N.G., who also had worked for Plaintiff, noted that "Scott Heagney was one of my favorite supervisors to work for in my 17 years of law enforcement."

21.10.7.    Similarly, Agent C.J. commented that "Scott is the best supervisor that I ever had. Outstanding supervisor and an even better person."

21.10.8.    Agent S.L. found Plaintiff Heagney to have been "one of the best supervisors I have had the pleasure to work for in my 22 years in law enforcement." S.L. added that SSA Heagney's "professionalism, character and credibility is unquestioned and above reproach."

21.10.9.    Another ATF agent (J.W.) described Plaintiff as a "great boss" for whom it was "an honor" and a privilege to work.

21.10.10.   Another subordinate (H.C.) likewise found SSA Heagney to be "by far the best supervisor I have had in my 21 years with ATF."

21.10.11.   Agent K.B. considered Plaintiff to be "one of the best supervisors I have ever worked for."

21.10.12.   A local municipal police officer (J.W.) who worked under Plaintiff as a Task Force Officer rated him as 10 on a scale of 1-10 for categories among which were "professionalism," "credibility," "engagement with the job," "compliance with ATF rules," and "protection of agent safety."

21.10.13.    Another police officer (M.O.) found SSA Heagney to be a "very safe, organized and outstanding ATF Supervisor."

21.10.14.    The same AUSA ("TB") whom OIG falsely reported had claimed that Heagney mishandled the gun-theft investigation (as discussed further below) remarked that, "Agents I interact with love and respect him and have no complaints. Many agents have said he is one of the best supervisors they have ever had."

21.11.  Of statements collected from ATF Special Agents, police officers, and other law enforcement colleagues, on a scale from 1 to 10, he was rated:

21.11.1.    As a 10 for professionalism by 80% of those responding, a nine by three other colleagues, and an eight by the remaining two responders.

### Approximate Timeline of Other Relevant Events

22.  <u>October 18, 2018</u>—The service firearm of Dallas Field Division Special Agent Daniel Meade is reported by him to have been stolen.

22.1.  Senior management of the Dallas Field Division conveyed to Heagney and others that immediate recovery of the weapon is essential (e.g., lest it end up being used in a crime and so publicly embarrass ATF).

23.  <u>October 28, 2018</u>—ATF conducts an operation to try to recover the firearm, with Heagney being one of two Group Supervisors on scene at a suspect's apartment.

23.1.  The operation was at an apartment in a geographic area under the control of Group Supervisor Joseph Patterson, not under Heagney's.

24.  <u>October 30, 2018</u>—Without Heagney's advance approval, the gun is bought back by ATF agents at a flea market from a felon who made a profit on the sale.

25. <u>Unknown Date</u> [per DOJ OIG ROI]—ATF Internal Affairs Division (IAD) opens an investigation into events related to the theft of Meade's firearm [presumed to have started sometime between October 30-November 9, 2018].

26. <u>November 8, 2018</u>—The Special Agent in Charge (SAC) of the Internal Affairs Division alerts Dallas Field Division SAC Jeff Boshek that an Assistant U.S. Attorney ("TB") in the Dallas area has concerns about Special Agent Meade.

27. <u>November 9, 2019</u>—The Internal Affairs Division SAC decides that AUSA TB should be interviewed about TB's concerns that Meade might be covering up facts surrounding the theft of his gun, given that Meade had begged TB not to seek a search warrant for his toll records and pressured TB not to prosecute the theft.

28. <u>November 27, 2019</u>—AUSA TB is interviewed and that session later transcribed.

    28.1.  While DOJ OIG would go to claim that TB identified Heagney as among those who engaged in misconduct and/or mishandled the investigation of the gun theft, the transcript reveals TB offered no such criticism of Heagney.

29. <u>November 28, 2019</u>—ATF Internal Affairs Division interviews five Special Agents/supervisors about related events, but Heagney is not among them, in this period when Heagney worked as a Group Supervisor in the Dallas Field Division.

30. <u>April 3, 2020</u>—Plaintiff Heagney's immediate supervisor (ASAC John Wester) emailed that he appreciated Heagney's leadership and he was doing a great job.

31. <u>June 2020</u>—Plaintiff Heagney provides a statement for the Equal Employment Opportunity investigation of a female agent's claims that she suffered sex discrimination and reprisal at the hands of Dallas Field Division management.

31.1.   Heagney's statement supported the agent's claims, disclosed inappropriate comments made in management meetings about the female agent, and described the unusual nature of how the female agent had been treated.

32.   July or August 2020—The female agent's EEO Report of Investigation, including Heagney's statement—is issued to the agent and provided to agency management.

33.   August 19, 2020—Plaintiff Heagney is told he is being involuntarily reassigned from the DFW area to a position in the Washington, D.C. area.

34.   September 23, 2020—Heagney files his own EEO complaint, asserting the reassignment was in response to his support of the female agent's EEO claims.[8]

35.   April 5, 2021—While his EEO complaint remains pending, Heagney is interviewed by DOJ OIG about the gun theft and recovery events.

35.1.   The primary OIG agent questioning Heagney is told during the interview that Heagney has a pending EEO complaint.

36.   May 12, 2021—Heagney requests an EEOC hearing of his claims of being punished for having spoken out in support of the female agent's EEO claims.

37.   November 17, 2021—Heagney is told by higher management that he must report for duty by February 13, 2022 to the reassignment in the D.C. area.

38.   November 19, 2021—DOJ OIG completes its work and transmits a Report of Investigation (Case # 2019-007127) to ATF of some 1,956 pages.

---

[8] Heagney's EEO activity associated with opposing the reassignment is raised in this present litigation as motivating further retaliation against Heagney. But whether the reassignment itself was in fact retaliatory is *not* at issue, given the eventual resolution by agreement (and without admission of fault) of that prior Heagney lawsuit against ATF. In other words, Heagney now claims retaliation for the earlier lawsuit but the merits of it are no longer at issue nor are the events in it re-raised here as a basis for seeking damages.

38.1.  The "Synopsis" page of this ROI says "CLOSED" in the field for "STATUS."

38.2.  No further investigation was conducted by DOJ of related matters.

38.3.  This marked the resolution of the "personnel investigation" of Plaintiff Heagney (and other agents involved in related events).[9]

38.4.  Nor was any further investigation of related matters conducted by staff of the ATF Internal Affairs Division after issuance of the DOJ OIG report.

38.5.  Note Heagney was unaware of the formal status of the DOJ OIG investigation between the time of his April 2021 interview and when he was provided a copy of the OIG Report of Investigation in October *2022*.

39.  [November 20, 2021 until early September 2022—ATF sits on the DOJ OIG ROI, taking no formal action in response to its findings.]

40.  December 16, 2021—Heagney gives notice he plans to retire February 21, 2022.

40.1.  He does so in light of having been told in November that his final deadline for reporting to the involuntary reassignment in the D.C. area is in February, also as the new job would take him out of supervision and otherwise involve less responsibility, force him to be separated from his wife, and lower chances for getting promoted in his final years at ATF.

40.1.1. As well, he had surpassed 20 years of service as a Special Agent and would reach mandatory retirement age in 2024.[10]

---

[9] As noted earlier, 5 U.S.C. § 3322 defines "personnel investigation" to include one by an Office of Inspector General, but makes no mention of including internal affairs inquiries.

[10] For reasons not relevant to recount here, often federal law enforcement agents retire after 20 years of service and they typically are subject to mandatory retirement at age 57.

40.2.   In other words, the timing of the retirement was not to avoid any open investigation nor to avoid any discipline proposed but not yet decided.

 40.2.1. No discipline was proposed against Heagney due to the OIG investigation, between his April 5, 2021 OIG interview and the (post-retirement) October 2022 ATF notice of a planned notation to file.

41.   <u>February 21, 2022</u>—Heagney's retirement from ATF becomes effective.

 41.1.   Though Heagney is unaware of the status at the time, this was more than three months after the DOJ OIG personnel investigation had concluded.

42.   <u>May 26, 2022</u>—ATF internally transmits the DOJ OIG ROI from Assistant Director/Chief Security Officer Celinez Nunez to the Chair of the Professional Review Board [Richard Coes] with copy to the Assistant Director for Field Operations [Thomas Chittum].

43.   <u>August 4, 2022</u>—With his EEO claims not yet having been resolved administratively, Heagney files a Title VII suit in federal district court. (The suit also claimed the forced reassignment resulted in his involuntary retirement.)

 43.1.   The suit makes 10 references to the same Thomas Chittum (Assistant Director of Field Operations) who (it later is learned) was one of the two May 2022 recipients of the DOJ OIG ROI about Heagney and other agents.

44.   <u>September 8, 2022</u>—As compared to the Chair of the ATF Professional Review Board (PRB) having received the DOJ OIG ROI almost four months earlier, the PRB only now meets to review the findings of that OIG Report of Investigation.

45.   <u>October 24, 2022</u>—The PRB issues notice to Heagney of the intent to make a permanent notation to his file based on the conclusions of the DOJ OIG ROI.

 45.1.   This is eight months after Heagney retired.

     45.2.   This is 11 months after the DOJ OIG ROI was completed and given to ATF.

          45.2.1. That is, 11 months after the "personnel investigation" was resolved.[11]

46.    <u>June 14, 2023</u>—The Bureau Deciding Official (John Schmidt) notifies Heagney that his opposition to the notation to file had been considered but ATF nonetheless decided to proceed with permanently (adversely) notating Heagney's file.

47.    <u>July 12, 2022</u>—Heagney files his appeal of the notation to file with MSPB in D.C.

48.    <u>September 28, 2023</u>—Plaintiff Heagney's Title VII suit in federal court (EDTX No. 4:22-cv-00675-SDJ) is dismissed due to an agreed resolution of the claims.

     48.1.   The agreement specifically carved out the notation to file and Heagney's challenge of it before MSPB as unresolved.

49.    <u>Today</u>—As of Heagney's successful filing of this new lawsuit, he will by filing with MSPB notify it of this suit and request the MSPB action be closed as a result.

**Evidence the Notation to File Action was Motivated by EEO Reprisal**

50.    Among evidence that the notation to file action (and the DOJ OIG investigation on which it was said to be based) were not run of the mill actions taken for legitimate, non-retaliatory reasons are the following.

51.    Given that Heagney did not retire until several months after the OIG personnel investigation was resolved (i.e., issuance of the November 2021 ROI), the appropriate action for ATF to take in October 2022 was to forego attempting a notation to file against Heagney that could follow him into later employment.

---

[11] It appears ATF contends the "personnel investigation" was resolved not with OIG's ROI in November 2021, but when ATF proposed the notation to file in October 2022. If correct, ATF could be in compliance with § 3322 even if waiting 20 years to propose a notation to file, since the deadline would run from whenever the date of the proposal.

52. Instead, ATF choose to disregard the requirements of 5 U.S.C. § 3322 and zealously go after Heagney with the notation to file action. For example:

    52.1. DOJ OIG resolved the "personnel investigation" with its Report of Investigation in November 2021 as compared to Heagney's not retiring until three months later in February 2022, so Heagney did not depart prior to the resolution and application of § 3322 to him by ATF was illegal.

        52.1.1. ATF oddly claims § 3322 extends "personnel investigation" to include work by its Internal Affairs Division, or even its Professional Review Board, but the statute says otherwise (emphasis supplied):

> (a)With respect to any employee occupying a position in the competitive service or the excepted service *who is the subject of a personnel investigation and resigns from Government employment prior to the resolution of such investigation*, the head of the agency from which such employee so resigns shall, if an adverse finding was made with respect to such employee pursuant to such investigation, make a permanent notation in the employee's official personnel record file. The head shall make such notation not later than 40 days after the date of the resolution of such investigation…

> (e)In this section, the term *"personnel investigation" includes—*
>     (1) *an investigation by an Inspector General*…

        52.1.2. That is, the statute makes no reference to internal affairs investigations or actions by a Professional Review Board; ATF's disregard of Congressional wording suggests an intent to retaliate.

53. A lead agent for the DOJ OIG investigation who interviewed Heagney was aware when questioning Heagney that Heagney had an EEO action pending against ATF.

54. The DOJ OIG ROI falsely claims that the involved Assistant U.S. Attorney (TB) asserted wrongdoing by Heagney when in fact that AUSA had not done so.

55.    Persons involved with the notation to file action were aware of Heagney's ongoing
       EEO activity at the time the notation to file matters were underway. For example:

55.1.    The former Assistant Director for Field Operations, Thomas Chittum, was
         the subject of ten mentions in Plaintiff's EEO suit over the forced
         reassignment and was aware Heagney was asserting wrongdoing by him.

55.1.1.    This same Thomas Chittum was given the DOJ OIG ROI in May
           2022, at the same time as it was transmitted to the chair of the ATF
           Professional Review Board.

55.2.    Richard Coes, Chair of the PRB that issued the October 2022 notice of
         planned notation to Heagney's file would—per Coes's deposition—regularly
         meet with Chittum when Chittum was associate director.

56.    The Dallas Special Agent in Charge (Jeff Boshek) who was another target of
       Heagney's earlier EEO lawsuit is a social friend of PRB Chair Richard Coes.

57.    Plaintiff's prior EEO lawsuit against ATF remained pending until September 2023,
       well after the notation to file action had been proposed and decided.

57.1.    There is thus a causal relation in time between Heagney's protected EEO
         activity and the action (notation to file) challenged as being retaliatory.

58.    While DOJ complained that there was no written search warrant for the October
       2018 search of the suspect's apartment (where Agent Meade's stolen property was
       recovered), the suspect's mother had testified to OIG that she had told the agents,
       "You can look" and she understood why the agents had to check through the
       apartment, to make sure no one was there that might "pop out and shoot them."

59.    While one of the suspects and his mother identified the other ATF Group
       Supervisor (JP) on scene at the apartment in October 2018 as having engaged in

misconduct toward the suspect, neither that suspect nor his mother identified Heagney as having mistreated the suspect or otherwise engaging in wrongdoing.

60.    Nor did any persons at the apartment file a formal complaint over the incidents.

61.    The primary subject of the DOJ OIG ROI had been Special Agent Daniel Meade— the one whose weapon was stolen—while Plaintiff Heagney and three other ATF employees were named as "Additional Subjects."

  61.1.    As noted earlier, Heagney was not even among the agents interviewed on November 28, 2019, instead first being interviewed in April 2021.

62.    As compared to Heagney's getting a permanent black mark on his federal personnel file, Special Agent Daniel Meade post-DOJ-OIG-ROI was allowed to work for ATF, notwithstanding substantiated findings by OIG's ROI Meade had:

  62.1.    *intentionally obstructed justice and lacked candor* during his voluntary OIG interviews and polygraph examination, by providing false information as to his route stops and the location his firearm was stolen from, in violation of ATF policies and procedures;

  62.2.    taken part in an unconstitutional search and seizure of a residence by searching the home of a civilian without a search warrant or consent and seized evidence in violation of the 4th Amendment and ATF policies;

  62.3.    violated a suspect's due process rights by intimately participating with the ATF's investigation and interview of a suspect while being the victim-witness of the crime, in violation of the 14th Amendment; and

  62.4.    left his (Meade's) firearm, badge, and iPad unattended in a government-owned vehicle from which they were stolen.

63. While DOJ/ATF identify the concerns raised by AUSA TB about the gun theft/investigation/recovery as what gave rise to the OIG's review of the events and its investigation of Heagney, TB in written testimony for the MSPB case stated:

    63.1. Heagney's interactions with the AUSA on related matters were more consistent with "someone attempting to ensure policy was followed" than with someone trying to cover something up;  and

    63.2. TB was "unaware of any actions that Scott Heagney improperly did or failed to do in the investigation into the theft of the firearm."

64. Finally, if ATF truly believed Heagney engaged in serious wrongdoing in October 2018, why wait *four years* (October 2220) to propose an action in response?

## LEGAL CLAIMS

65. With the district court now standing in the shoes of the MSPB as to this mixed case, Plaintiff Heagney requests it take actions such as the following (again, pled in addition and in the alternative to each other).

66. First, to reverse the notation to file action on the basis that it was not in accordance with law. For example, 5 U.S.C. § 3322 applies when an employee departs prior to resolution of a personnel investigation. But here, the only "personal investigation" as defined by § 3322 was the one conducted by DOJ OIG and it closed on November 19, 2021, as compared to Heagney's not retiring until February 2022.

67. Second, to reverse the notation to file action on the basis that it was the result of harmful procedural error. For example, the action was taken even though Heagney did not retire until months *after* the personnel investigation concluded.

67.1.  Among other examples, DOJ/ATF did not meet the five-day deadline to provide Heagney with the findings of the investigation from the date the investigation was resolved.

67.2.  As well, the statutory 40-day deadline for making the notation to file ran in December 2021 versus the notation's not even being proposed until October 2022.

68.  Third, to reverse the notation to file action on the basis that it was the result of harmful procedural error in that the *Douglas* Factors were not applied.

68.1.  When an agency act is in the nature of a disciplinary action rather than one based on failed performance, these factors are used to weigh the appropriateness of the penalty. For example, here the PRB or Deciding Official should have decided to impose some lesser punishment based on such factors. For example, by issuing a letter of warning rather than permanently marking Heagney's file, given the mitigating circumstances.[12]

69.  Fourth, to reverse the notation to file action on the basis that the claims of misconduct/mishandling as to the gun theft/investigation/recovery were not supported by preponderance of the evidence.

---

[12] The Federal Circuit has held the *Douglas* Factors to be applicable to an agency disciplinary action even where the relevant statute makes no mention of whether or not they apply. *See Connor v. Dep't of Veterans Affs*., 8 F.4th 1319, 1326 (Fed. Cir. 2021) (*Douglas* Factors applicable to abbreviated 38 U.S.C. § 714 VA disciplinary procedures).

70.    Fifth, to reverse the notation to file action on the basis that it was the result of a prohibited personnel practice, such as EEO reprisal in violation of Title VII.[13]

71.    Sixth, apart from whatever relief MSPB could have granted, to find the notation to file action was motivated by Heagney's EEO activity and so violates Title VII (e.g., 42 U.S.C. § 2000e-16: federal employment to be free from discrimination).

72.    Seventh, to rely on the Declaratory Judgment Act (28 U.S.C. § 2201, per authorization of 5 U.S.C. §§ 702-03) to rule that 5 U.S.C. § 3322 does not include within the phrase "personnel investigation" an investigation conducted by an agency's internal affairs staff, nor an agency's Professional Review Board, and instead only applies to an Inspector General (OIG) investigation.

73.    Eighth, to award Plaintiff Heagney attorney fees, compensatory damages, and other damages, in the event of a reversal of the notation to file action and/or a finding that it violated Title VII, with the goal of placing him in as good of a position as he would have been in if not for the improper agency actions. For example:

73.1.    Title VII allows an award of fees to a prevailing federal employee plaintiff (per 42 U.S.C. § 2000e-16 and § 2000e-5(k)).

73.2.    42 U.S.C. § 1981a authorizes compensatory damages to be awarded by this Court for a finding of intentional discrimination.

[13] Federal employees fall under a Title VII provision that requires actions to "free from any discrimination." To the extent the Court nonetheless holds the standard for reprisal here to be "but for" rather than "motivating factor" and that only the lower standard was met, Plaintiff nonetheless seeks declaratory relief and an award of fees/expenses.

73.3.   Attorney fees and costs are authorized by 5 U.S.C. § 7701(g) where a plaintiff is the prevailing party and such an award is in the interest of justice.[14]

73.4.   Consequential damages are authorized by 5 U.S.C. 1214(h) where the Board orders corrective action to remedy a prohibited personnel practice and determines that the employee has been subjected to an agency investigation commenced, expanded, or extended in retaliation for the disclosure or protected activity that formed the basis of the corrective action.

73.5.   Compensatory damages are available under 42 U.S.C. § 1981a for discrimination in employment.

74.   Ninth, to grant Plaintiff such other and further relief to which the Court may find him to be entitled, whether costs, expenses, interest, or otherwise.

75.   Tenth, to retain jurisdiction as needed to ensure compliance with such orders.[15]

## JURY REQUEST

76. Plaintiff requests that a jury resolve all factual issues.

---

[14] The "interest of justice" standard is met such as where the agency committed a prohibited personnel practice (e.g., intentional discrimination/reprisal), the agency action was clearly without merit, the action was initiated in bad faith such as for harassment, the agency committed a gross procedural error that prolonged the appeal or severely prejudiced the plaintiff, or the agency knew or should have known it was not likely to prevail on the merits when it took the action. Multiple of those apply here.

[15] In the unlikely event the Court were to mistakenly determine that any award of fees from the MSPB proceedings could only be granted by MSPB, then Plaintiff would request a remand to MSPB solely on the issue of the calculation of fees for that work.

## PRAYER

FOR SUCH REASONS, Plaintiff requests judgment be entered in his favor, that he be granted relief like that described above along with any other relief in law or equity determined by the Court to be appropriate, and that Defendant be denied all relief.

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
1629 K St., NW, Ste. 300
Washington, DC 20006
(202) 540-9950
(202) 683-6130 fax

510 Austin Ave., Ste. 110
Waco, TX 76701
(254) 776-3939

By: _____
David R. Schleicher          *david@gov.law*
DC Bar No. 428001