# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SCOTT L. HEAGNEY,

        *Plaintiff*,

    v.

PAMELA BONDI,[1]

        *Defendant*.

Civil Action No. 24 - 2592 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

Scott L. Heagney is a former federal employee who served at the Department of Justice (DOJ) in the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) until his retirement. During his time at ATF, he was investigated by internal affairs staff and by DOJ's Office of the Inspector General (OIG). After the OIG investigation ended, Mr. Heagney retired from federal service. Over eight months later, ATF placed a permanent and adverse notation in Mr. Heagney's Official Personnel File (OPF). Mr. Heagney believes this notation was retaliation for an Equal Employment Opportunity complaint and subsequent lawsuit alleging retaliation for an earlier protected activity. He therefore brings several claims under the Civil Service Reform Act (CSRA), Title VII of the Civil Rights Act of 1964, and the Declaratory Judgment Act. For the following reasons, the Court dismisses all but the Title VII claims under Rule 12(b)(6).

---

[1] Although the Plaintiff named former Attorney General Merrick B. Garland as the Defendant in this Complaint, current Attorney General Pamela Bondi is "automatically substituted as a party" in his place pursuant to Federal Rule of Civil Procedure 25(d).

## BACKGROUND

### A.    Statutory and Regulatory Background

### 1.    The CSRA and Title VII

There are "two statutory schemes that govern the process by which a civil servant may challenge an adverse employment action when she claims that she was not only treated unfairly but in violation of her civil rights." *Vickers v. Powell*, 493 F.3d 186, 191 (D.C. Cir. 2007). First, "[t]he Civil Service Reform Act of 1978 . . . grants civil servants . . . a statutory right to appeal adverse employment actions to the Merit Systems Protection Board" (MSPB). *Id.* Second, the antiretaliation provision of Title VII of the Civil Rights Act of 1964 "prohibits an employer from 'discriminat[ing] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)). "[A] mixed case is one in which the employee 'has been affected by an action which the employee . . . may appeal to the [MSPB], and alleges that a basis for the action was discrimination prohibited by' Title VII, among other statutes." *Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 260 (D.D.C. 2013) (quoting 5 U.S.C. § 7702(a)(1)); *see also Robinson v. Dep't of Homeland Sec. Off. of Inspector Gen.*, 71 F.4th 51, 53 (D.C. Cir. 2023) (including retaliation claims).

"An employee who intends to pursue a mixed case has several paths available to her." *Butler v. West*, 164 F.3d 634, 638 (D.C. Cir. 1999). She can first choose between filing a "mixed case complaint" with her agency's EEO office or filing a "mixed case appeal" with the MSPB. *Id.* (citing 29 C.F.R. § 1614.302(b)). "Should she select the agency EEO route, within thirty days of a final decision she can file an appeal with the MSPB or a civil discrimination action in federal district court." *Id.* (citing 29 C.F.R. §§ 1614.302(d)(1)(ii), 1614.302(d)(3), 1614.310(a)). "If 120

days pass without a final decision from the agency's EEO office, the same avenues of appeal again become available: the complainant can file either a mixed case appeal with the MSPB or a civil action in district court." *Id.* (citing 5 U.S.C. §§ 7702(e)(1)(A), 7702(e)(2); 29 C.F.R. §§ 1614.302(d)(1)(i), 1614.310(g); 5 C.F.R. § 1201.154(b)(2)). "When a complainant appeals to the MSPB, either directly or after pursuing her claim with the agency EEO office, the matter is assigned to an Administrative Judge who takes evidence and eventually makes findings of fact and conclusions of law." *Id.* (citing 5 C.F.R. §§ 1201.41(b), 1201.111). But "if the MSPB fails to render a judicially reviewable decision within 120 days from the filing of a mixed case appeal, the aggrieved party can pursue her claim in federal district court." *Id.* at 639 (citing 5 U.S.C. § 7702(e)(1)(B)).

### 2.    Section 3322

5 U.S.C. § 3322 applies when an agency employee resigns during an ongoing personnel investigation that eventually results in an adverse finding. It states that "the head of the agency from which such employee so resigns shall, if an adverse finding was made with respect to such employee pursuant to such investigation, make a permanent notation in the employee's official personnel record file" (OPF). *Id.* § 3322(a). It also establishes a couple deadlines. First, "[t]he head shall make such notation not later than 40 days after the date of the resolution of such investigation." *Id.* And second, "[p]rior to making a permanent notation in an employee's official personnel record file under subsection (a), the head of the agency shall . . . notify the employee in writing within 5 days of the resolution of the investigation and provide such employee a copy of the adverse finding and any supporting documentation[.]" *Id.* § 3322(b).

B.      **Factual Background**

The Court draws the facts, accepted as true, from the Plaintiff's Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

Mr. Heagney is a former federal employee who served in various positions at ATF until his retirement. *See* Compl. ¶¶ 7, 20 ("Group Supervisor/Senior Special Agent"), ECF No. 1. During his time at ATF, he "was considered by management to be a high performer." *Id.* ¶ 20. For example, in his 2018 annual evaluation, the head of the ATF Dallas Field Division thanked Mr. Heagney "for working so hard to get [his] group to that 'next level.'" *Id.* ¶ 21.3; *see also id.* ¶ 21.1. The following year, in his 2019 annual evaluation, Mr. Heagney received six out of a possible seven points. *Id.* ¶ 21.5. And his good reputation extended to peers as well. According to Mr. Heagney, he received "input from his colleagues," *id.* ¶ 21.10, and he was rated as "a 10 for professionalism by 80% of those responding, a nine by three other colleagues, and an eight by the remaining two responders," *id.* ¶ 21.11.1.

On October 18, 2018, Special Agent Daniel Meade reported that his firearm had been stolen. *Id.* ¶ 22. Ten days later, on October 28, 2018, ATF conducted "an operation to try to recover the firearm." *Id.* ¶ 23. Mr. Heagney was one of the two Group Supervisors "on scene at [the] suspect's apartment." *Id.* That said, the apartment fell within the geographic area under the control of the other Group Supervisor, not Mr. Heagney. *Id.* ¶ 23.1. A couple days after the operation, on October 30, 2018, "the gun [was] bought back by ATF agents at a flea market[.]" *Id.* ¶ 24. Mr. Heagney did not provide advance approval of this transaction. *See id.*

Likely sometime between October 30 and November 9, 2018, the ATF Internal Affairs Division opened an investigation into the events surrounding the theft of Mr. Meade's firearm. *Id.* ¶ 25. On November 28, 2019, ATF Internal Affairs interviewed five employees about the

events, "but [Mr.] Heagney [was] not among them[.]" *Id.* ¶ 29. And on April 3, 2020, Mr. Heagney's immediate supervisor emailed him to tell him that "he appreciated [Mr.] Heagney's leadership" and that "he was doing a great job." *Id.* ¶ 30.

Things took a turn for the worse that summer. In June 2020, Mr. Heagney provided a statement for the Equal Employment Opportunity (EEO) investigation into a female agent's claims that she had been the subject of unlawful sex discrimination and reprisal. *Id.* ¶ 31. His statement "supported the agent's claims, disclosed inappropriate comments made in management meetings about the female agent, and described the unusual nature of how the female agent had been treated." *Id.* ¶ 31.1. In July or August 2020, Mr. Heagney's statement was provided to agency management. *Id.* ¶ 32. Then on August 19, 2020, Mr. Heagney was notified that he was being "involuntarily reassigned from the DFW area to a position in the Washington, D.C. area." *Id.* ¶ 33. He thought this was in response to his support of the female agent's claims, so he filed his own EEO complaint on September 23, 2020. *Id.* ¶ 34.

On April 5, 2021, while Mr. Heagney's EEO complaint was still pending, DOJ's OIG interviewed Mr. Heagney about the events surrounding the gun theft and recovery. *Id.* ¶ 35. The primary interviewer was "told during the interview that [Mr.] Heagney ha[d] a pending EEO complaint." *Id.* ¶ 35.1. On November 19, 2021, the OIG "complete[d] its work and transmit[ted] a Report of Investigation . . . to ATF of some 1,956 pages." *Id.* ¶ 38. At this point, the "Synopsis" page of the report sa[id] "CLOSED." *Id.* ¶ 38.1. Mr. Heagney was not aware of the formal status of the OIG investigation at the time. *Id.* ¶ 38.5. Nor did the ATF take any immediate formal action in response to the findings. *Id.* ¶ 39.

On December 16, 2021, Mr. Heagney gave notice that he planned to retire that upcoming February. *Id.* ¶ 40. He did so because the deadline to move to the D.C. area was set for February,

and he did not want to report to the involuntary assignment since he would have less responsibility, would be separated from his wife, and would have lower odds for promotion. *Id.* ¶ 40.1. According to Mr. Heagney, he did not decide to retire to avoid any open investigation or proposed discipline. *Id.* ¶ 40.2. Mr. Heagney's retirement became effective on February 21, 2022. *Id.* ¶ 41.

On May 26, 2022, ATF internally transmitted the OIG report to Richard Coes, the Chair of the Professional Review Board, and Thomas Chittum, the Assistant Director for Field Operations. *Id.* ¶ 42. On August 4, 2022, with his EEO claims still unresolved, Mr. Heagney filed a Title VII suit in federal district court. *Id.* ¶ 43. The suit made ten references to Mr. Chittum. *Id.* ¶ 43.1. About a month later, on September 8, 2022, the Professional Review Board met to review the OIG report. *Id.* ¶ 44. The Chair of the Board had regularly met with Mr. Chittum when Mr. Chittum was an associate director, *id.* ¶ 55.2, and was also a "social friend" of Jeff Boshek, who was "another target of [Mr.] Heagney's earlier EEO lawsuit," *id.* ¶ 56. And on October 24, 2022, the Board notified Mr. Heagney that it intended to make a permanent notation to his OPF. *See id.* ¶ 45 (referring to Mr. Heagney's "file"); *see also id.* ¶ 66 (citing 5 U.S.C. § 3322 to challenge the notation); *Schiavone v. Dep't of the Army*, No. PH-3322-20-0277-I-1, 2024 WL 3874739, at *1 n.2 (M.S.P.B. Aug. 19, 2024) (saying "5 U.S.C. § 3322 . . . grant[s] Board appeal rights to former employees to challenge an agency's decision to place a notation of [certain] finding[s] in the employee's *official personnel folder*" (emphasis added)). This came eight months after Mr. Heagney had retired and eleven months after the OIG report was completed and submitted to ATF. *See id.* ¶¶ 45.1, 45.2. On June 14, 2023, Mr. Heagney was notified that his opposition to the notation had been considered but that ATF still "decided to proceed with permanently (adversely) noting" his file. *Id.* ¶ 46.

"The primary subject" of the OIG report was Mr. Meade—the individual whose weapon was stolen—while Mr. Heagney was only an "Additional Subject[.]" *Id.* ¶ 61. Yet Mr. Heagney received "a permanent black mark on his federal personnel file," and Mr. Meade "was allowed to work for ATF." *Id.* ¶ 62. This despite the OIG report finding that Mr. Meade had "intentionally obstructed justice and lacked candor during his voluntary OIG interviews . . . by providing false information as to his route stops and the location his firearm was stolen from, in violation of ATF policies and procedures; taken part in an unconstitutional search and seizure of a residence by searching the home of a civilian without a search warrant or consent and seized evidence in violation of the 4th Amendment and ATF policies; violated a suspect's due process rights by intimately participating with the ATF's investigation and interview[ing a] suspect while being the victim-witness of the crime . . . ; and left his . . . firearm, badge, and iPad unattended in a government-owned vehicle from which they were stolen." *Id.* ¶ 62 (cleaned up).

On July 12, 2023, Mr. Heagney appealed the notation decision to the MSPB. *Id.* ¶ 47 (presumably writing 2022 as a typo). A few months later, on September 28, 2023, Mr. Heagney's old Title VII suit was dismissed from federal court following "an agreed resolution of the claims" that "specifically carved out the notation . . . and [Mr.] Heagney's challenge of it before MSPB as unresolved." *Id.* ¶ 48. Finally, on September 9, 2024, Mr. Heagney filed this lawsuit in federal court. *See id.* ¶ 49.

### C. Procedural Background

On September 9, 2024, Mr. Heagney filed a Complaint in this Court, alleging several claims under the CSRA, Title VII, and the Declaratory Judgment Act. *See id.* ¶¶ 65–75. On January 10, 2025, the Defendant moved to dismiss Mr. Heagney's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. Def.'s Mot.

Dismiss at 1, ECF No. 10. This motion is fully briefed and ripe for review. *See* Pl.'s Opp'n, ECF No. 14; Def.'s Reply, ECF No. 16.

## LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has properly stated a claim upon which relief may be granted." *Kursar v. Transp. Sec. Admin.*, 751 F. Supp. 2d 154, 163 (D.D.C. 2010). "In evaluating a motion under Rule 12(b)(6), the court must 'treat the complaint's factual allegations as true . . . and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Donelson v. U.S. Bureau of Prisons*, 82 F. Supp. 3d 367, 370 (D.D.C. 2015) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up)). But the Court need not accept the plaintiff's "legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (cleaned up). "[T]he court 'may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which . . . judicial notice' may be taken." *Donelson*, 82 F. Supp. 3d at 371 (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

## DISCUSSION

Mr. Heagney raises several claims under the CSRA, Title VII, and the Declaratory Judgment Act. *See* Compl ¶¶ 65–75. In briefing the instant motion, both Parties have organized the claims into four different groups: (1) claims that rely on the meaning of 5 U.S.C. § 3322 in some way, (2) claims alleging retaliation under Title VII, (3) a claim alleging that the OIG findings of misconduct were not supported by the preponderance of the evidence, and (4) a claim alleging that the Defendant failed to consider the *Douglas* factors when it decided to make a notation in Mr. Heagney's OPF. *See* Pl.'s Opp'n; Def.'s Reply. For the following reasons, the Court dismisses all of the claims except for those alleging retaliation in violation of Title VII.

### A.    Section 3322 Claims

Mr. Heagney's first, second, and seventh claims all rely on Section 3322. First, Mr. Heagney claims that the notation "was not in accordance with law" because 5 U.S.C. § 3322 permits a notation only when an employee departs prior to the resolution of a personnel investigation and Mr. Heagney departed after his OIG investigation had resolved. Compl. ¶ 66. Second, Mr. Heagney claims that the notation "was the result of harmful procedural error" because the Defendant allegedly failed to follow the requirements set by 5 U.S.C. § 3322. *Id.* ¶ 67. And third, Mr. Heagney asks the Court "to rely on the Declaratory Judgment Act . . . to rule that 5 U.S.C. § 3322 does not include within the phrase 'personnel investigation' an investigation conducted by an agency's internal affairs staff, nor an agency's Professional Review Board, and instead only applies to an Inspector General (OIG) investigation." *Id.* ¶ 72. The Court will take each in turn.

### 1.    Accordance with Law

Mr. Heagney first claims that the notation "was not in accordance with law." *Id.* ¶ 66. Although he does not identify the source of law, the Court deduces that this claim is likely grounded in 5 U.S.C. § 7701. This statutory provision says that "[a]n employee . . . may submit an appeal to the [MSPB] from any [agency] action which is appealable to the Board under any law, rule, or regulation." *Id.* § 7701(a). And it further provides that "the agency's decision may not be sustained . . . if the employee . . . shows that the decision was not in accordance with law." *Id.* § 7701(c)(2)(C). Mr. Heagney says he is bringing this claim because the Court is "now standing in the shoes of the MSPB," Compl. ¶ 65, and this provision outlines the MSPB's standard of review, *see How to File an Appeal*, U.S. Merit Systems Protection Board, https://perma.cc/RD4Y-BXYJ, so the Court will construe this claim as arising under 5 U.S.C. § 7701.

Unfortunately for Mr. Heagney, he cites no law disallowing a federal employer from placing a permanent notation in an employee's OPF. The only statute he cites is 5 U.S.C. § 3322, which provides:

> With respect to any employee occupying a position in the competitive service or the excepted service who is the subject of a personnel investigation and resigns from the Government employment prior to the resolution of such investigation, the head of the agency from which such employee so resigns shall, if an adverse finding was made with respect to such employee pursuant to such investigation, make a permanent notation in the employee's official personnel record file.

*Id.* § 3322(a). But as is clear from the text, this provision merely provides when an agency head *must* make a permanent notation, not when an agency head *may not* do so. Perhaps such a law exists, but Mr. Heagney has not identified it in his Complaint. He therefore fails to plausibly allege that the notation "was not in accordance with law." *Id.* ¶ 66; *cf., e.g., Gebert v. U.S. Dep't of State*, No. 22-cv-2939, 2024 WL 1328439, at *9 (D.D.C. Mar. 27, 2024) (dismissing a claim that the defendant's decision to terminate health insurance was "not in accordance with law" because the plaintiff "identifies no law requiring [the defendant] to retain [the plaintiff's] health insurance").

### 2.    Procedural Error

Mr. Heagney next claims that the notation "was the result of harmful procedural error." Compl. ¶ 67. Again, the Court construes this claim to be grounded in 5 U.S.C. § 7701, which provides that an "agency's decision may not be sustained . . . if the employee . . . shows harmful error in the application of the agency's procedures in arriving at such decision." *Id.* § 7701(c)(2)(A). "The agency's 'procedures' considered . . . in applying § 7701(c)(2)(A) include . . . procedures required by statute, rule, or regulation[.]" *Cornelius v. Nutt*, 472 U.S. 648, 658 (1985).

Mr. Heagney claims that the Defendant made three procedural errors, all flowing from 5 U.S.C. § 3322. *See* Compl. ¶ 67. First, he alleges that the Defendant made the notation "even

though [Mr.] Heagney did not retire until months *after* the personnel investigation concluded." *Id.* But this is insufficient because, as the Court has explained, 5 U.S.C. § 3322 merely provides the circumstances in which an agency head must place a permanent notation in an employee's OPF; it does not prohibit such an action outside of those circumstances. *See supra*, at 10. So this cannot form the basis of Mr. Heagney's procedural error claim. Second, he alleges that "the statutory [forty]-day deadline for making the notation to file ran in December 2021," long before the notation was proposed in October 2022. *Id.* ¶ 67.2. And third, he alleges that the Defendant "did not meet the five-day deadline to provide [Mr.] Heagney with the findings of the investigation from the date the investigation was resolved." Compl. ¶ 67.1. Resolving whether Mr. Heagney has plausibly alleged a violation of these final two procedures requires looking to the statute.

5 U.S.C. § 3322(a) provides that an agency head "shall . . . make a permanent notation in [an] employee's official personnel record" when an employee "who is the subject of a personnel investigation" resigns "prior to the resolution of such investigation" and "an adverse finding was made with respect to such employee pursuant to such investigation[.]" *Id.* It then requires the agency head to "make *such notation* not later than 40 days after the date of the resolution of such investigation." *Id.* (emphasis added). And Subsection 3322(b) requires the agency head to "notify the employee in writing within 5 days of the resolution of the investigation and provide such employee a copy of the adverse finding and any supporting documentation" "[p]rior to making a permanent notation in an employee's official personnel record file *under subsection (a)*[.]" *Id.* (emphasis added). This means that the applicability of both deadlines turns on whether Mr. Heagney's notation was made pursuant to 5 U.S.C. § 3322(a).

Nothing in the record suggests that Mr. Heagney's notation was made pursuant to 5 U.S.C. § 3322(a). It is true that he "resign[ed] from Government employment" and was subject

to two different "investigation[s]," but neither of those investigations provides a basis for notation under the statute. 5 U.S.C. § 3322(a). First, Mr. Heagney alleges he was subject to an OIG investigation that had already begun by April 2021. *See* Compl. ¶ 35. But this investigation ended in November 2021, *id.* ¶ 38, about a month before Mr. Heagney provided notice of his retirement, *id.* ¶ 40. So Mr. Heagney cannot be said to have "resign[ed] from Government employment prior to the resolution of such investigation[.]" 5 U.S.C. § 3322(a). Second, Mr. Heagney alleges that an internal affairs investigation began in 2018. *See* Compl. ¶ 25. And it appears that he concedes that the investigation was still pending when he retired. *Cf.* Def.'s Mem. Supp. Mot. Dismiss (Def.'s Mem. Supp.) at 7, ECF No. 10-1 ("[A]s [Mr.] Heagney concedes, the Internal Affairs investigation . . . remained ongoing for long after the Inspector General investigation ended."). But his retirement during this investigation does not warrant a notation under the statute because Mr. Heagney never alleges that "an adverse finding was made with respect to [him] *pursuant to such investigation*[.]" 5 U.S.C. § 3322(a) (emphasis added). What matters under the statute is that the employee resigns during an investigation that ultimately results in an adverse finding. Section 3322 does not apply just because some other investigation that was already complete at the time of resignation eventually makes an adverse finding. So the internal affairs investigation does not provide a basis for a notation under Section 3322 either.

This means that the statutory deadlines cited by Mr. Heagney do not apply to his notation. *See* 5 U.S.C. § 3322(a) (requiring an agency head to "make *such notation* not later than 40 days after the date of the resolution of such investigation" (emphasis added)); *id.* § 3322(b) (requiring an agency head to "notify the employee in writing within 5 days of the resolution of the investigation and provide such employee a copy of the adverse finding and any supporting documentation" "[p]rior to making a permanent notation in an employee's official personnel

record file *under subsection (a)*" (emphasis added)). Mr. Heagney therefore fails to plausibly allege any procedural error.

### 3. Declaratory Judgment Act

Mr. Heagney also asks the Court to "rely on the Declaratory Judgment Act . . . to rule that 5 U.S.C. § 3322 does not include within the phrase 'personnel investigation' an investigation conducted by an agency's internal affairs staff, nor an agency's Professional Review Board, and instead only applies to an Inspector General (OIG) investigation." Compl. ¶ 72. The Declaratory Judgment Act (DJA) provides that:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The DJA is "an enabling Act, which confers discretion on the courts rather than an absolute right on a litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (cleaned up). It is a "remedial arrow in the district court's quiver," "creat[ing] an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Id.* at 288. "The exercise of jurisdiction under [the DJA] is permissive and 'has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'" *Malibu Media, LLC v. Parsons*, No. 12-cv-1331, 2013 WL 12324463, at *9 (D.D.C. May 31, 2013) (quoting *Wilton*, 515 U.S. at 286). "As a result, in declaratory judgment actions 'the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicability and wise judicial administration.'" *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 401 (D.C. Cir. 2012) (quoting *Wilton*, 515 U.S. at 288).

"The D.C. Circuit has enumerated a number of relevant considerations to guide courts in deciding whether to exercise jurisdiction under the [DJA.]" *Gravity Defyer Med. Tech. Corp. v.*

*FTC*, No. 22-cv-1157, 2023 WL 2571758, at \*5 (D.D.C. Mar. 20, 2023) (cleaned up). These include "whether [a declaratory judgment] would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of 'procedural fencing'; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976). "Although every factor need not be considered and others may be, . . . these factors focus on the usefulness of a declaratory judgment, the role of such relief in ending the dispute between the parties, and the incentives for parties' behavior." *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 697 (D.C. Cir. 2015) (cleaned up).

The Court declines to exercise jurisdiction over Mr. Heagney's DJA claim. Providing the requested relief would not "finally settle the controversy between the parties," *Hanes Corp.*, 531 F.2d at 591 n.4, because the scope of Section 3322 does not set the bounds for when an agency may place a permanent notation in a former employee's OPF—it merely details when an agency *must* make such a notation, *see supra*, at 10. And providing this declaratory relief would not serve the "underlying purpose" of the DJA. *Malibu Media, LLC*, 2013 WL 12324463 at \*9. The DJA was meant to "give[] a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so." *Id.* (quoting 10B Charles Alan Wright et al., Federal Practice & Procedure § 2751 (3d ed. 2013)). But Mr. Heagney is not barred from seeking injunctive relief in this case. The Court therefore exercises its discretion and declines to exercise jurisdiction over this claim.

**B.      Retaliation Claims**

Mr. Heagney's fifth and sixth claims allege that ATF's notation was a retaliatory act that violated Title VII. *See* Compl. ¶¶ 70 (asking the Court to "reverse the notation to file action on the basis that it was the result of a prohibited personnel practice, such as EEO reprisal in violation of Title VII"); 71 (asking the Court "to find the notation to file action was motivated by [Mr.] Heagney's EEO activity and so violates Title VII"). Title VII's "antiretaliation provision . . . prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)). This provision applies "with equal force in both private and federal-sector cases." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Libr. of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013) (cleaned up).

"To establish a prima facie case of retaliation" under Title VII, a plaintiff must demonstrate that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." *Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006); *see also Ho v. Garland*, 106 F.4th 47, 51 (D.C. Cir. 2024). But a plaintiff need not plead a prima facie case in order to survive a motion to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) ("The prima facie case . . . is an evidentiary standard, not a pleading requirement."); *accord Chien v. Sullivan*, 313 F. Supp. 3d 1, 14 (D.D.C. 2018); *Liu v. Georgetown Univ.*, No. 22-cv-157, 2024 WL 4362128, at *8 (D.D.C. 2024). She need only "plead facts sufficient to nudge her claims 'across the line from conceivable to plausible.'" *Short v. D.C. Dep't of Corr.*, No. 23-cv-261, 2024 WL

1213769, at *6 (D.D.C. Mar. 20, 2024) (quoting *Arthur v. D.C. Hous. Auth.*, No. 18-cv-2037, 2020 WL 7059552, at *5 (D.D.C. Dec. 2, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009))). "To that end, courts may use the *prima facie* 'elements as a guide in [assessing] the plausibility of a plaintiff's claim for relief.'" *Id.* (quoting *Arthur*, 2020 WL 7059552, at *5).

### 1.    Protected Activity

Although his Complaint is far from clear, Mr. Heagney appears to allege that he engaged in two statutorily protected activities. *See* Compl. ¶¶ 34 & n.8, 43. First, he alleges that on September 23, 2020, he "file[d] his own EEO complaint, asserting the reassignment was in response to his support of the female agent's EEO claims." *Id.* ¶ 34. And he adds that this "EEO activity . . . is raised in this present litigation as motivating further retaliation against [Mr.] Heagney." *Id.* n.8. Second, Mr. Heagney alleges that on August 4, 2022, he "file[d] a Title VII suit in federal district court" after his EEO claims were left unresolved. *Id.* ¶ 43. And he states that he "now claims retaliation for [this] earlier lawsuit" even though the merits of that case are no longer at issue. *Id.* ¶ 34 n.8. "[S]tatutorily protected activities include the filing of EEOC complaints and the initiation of litigation to vindicate claims of employment discrimination or retaliation." *Battle v. Master Sec. Co., LLC*, 298 F. Supp. 3d 250, 252 (D.D.C. 2018) (cleaned up). So the Court will proceed to the remaining elements.

### 2.    Materially Adverse Action

Title VII's antiretaliation provision "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 57. In the retaliation context, this means that "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* Such actions need not "affect the terms

and conditions of employment." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011). To the contrary, Title VII's antiretaliation provision "must be construed to cover a broad range of employer conduct." *Id.* at 173. This means that "the 'material adversity' inquiry" in the retaliation context "is necessarily context-specific and 'is simply not reducible to a comprehensive set of clear rules.'" *Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 75 n.16 (D.D.C. 2011) (quoting *Thompson*, 562 U.S. at 175). One exception is that the "standard for judging harm must be objective, so as to avoid the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Thompson*, 562 U.S. at 175 (cleaned up).

Mr. Heagney argues that the permanent notation in his OPF plausibly meets this standard. *See* Pl.'s Opp'n at 20–22. And the Court agrees. The notation "is not [a] run-of-the-mill criticism" but rather "a forever stain on a lifetime of law enforcement"—a stain that may well negatively affect future law enforcement employment. *Id.* at 21–22. A reasonable worker could be dissuaded from speaking up in the face of such a blot on his record. *Cf. Walker v. Johnson*, 501 F. Supp. 2d 156, 173 (D.D.C. 2007) (finding a letter of reprimand "could be sufficient to dissuade an objectively reasonable employee from participating in EEO activities" in part "[b]ecause it was to remain in [the plaintiff's] official personnel file for two years"). The Court is unconvinced by the Defendant's arguments that this conclusion is foreclosed as a matter of law.

*First*, the Defendant argues that under binding D.C. Circuit precedent, "[l]etters of counseling or reprimand are not adverse actions when they contain no abusive language, but rather job-related constructive criticism, nor when they fail to affect the plaintiff's salary, bonus, or other benefits." Def.'s Mem. Supp. at 8 (quoting *Spence v. Dep't of Veterans Affs.*, 109 F.4th 531, 540 (D.C. Cir. 2024) (cleaned up)) (collecting cases). But *Spence* is not dispositive because it did not address permanent notations in OPFs. And the Court declines to extend *Spence* to this scenario.

When announcing the "materially adverse" standard in the retaliation context, the Supreme Court "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69. Put more simply: "Context matters." *Id.* The Court later explained that it had "adopted a broad standard in *Burlington* because Title VII's antiretaliation provision is worded broadly." *Thompson*, 562 U.S. at 175. It warned against elevating "a preference for clear rules" above the statutory text, ultimately concluding that because of the text "and the variety of workplace contexts in which retaliation may occur, Title VII's antiretaliation provision is simply not reducible to a comprehensive set of clear rules." *Id.*

Applying those teachings, the Court declines to extend *Spence* to permanent notations in an OPF. Courts have historically been less bothered by letters of reprimand that were not placed in an OPF. *See, e.g.*, *Bowden v. Clough*, 658 F. Supp. 2d 61, 85 n.17 (D.D.C. 2009) ("Regardless, the counseling letter was never placed in the plaintiff's personnel file, . . . and accordingly the Court cannot conclude that this unofficial reprimand for admitted conduct . . . would dissuade a reasonable employee from making or supporting a charge of discrimination." (cleaned up)); *compare Williams v. Dodaro*, 806 F. Supp. 2d 246, 251, 259 (treating a letter of reprimand placed in the plaintiff's OPF for up to three years as a materially adverse action for summary judgment without challenge by the defendant), *with Williams v. Dodaro*, 576 F. Supp. 2d 72, 88–89 (D.D.C. 2008) (finding a so-called "written reprimand" was not materially adverse in part because "it was not placed" in the plaintiff's OPF). And even when letters of reprimand have been placed in an OPF, courts concluding those letters were not materially adverse have been quick to point out that the letters were not put in the OPF permanently. *See, e.g.*, *Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 75 (D.D.C. 2011) ("Herbert's letter of reprimand was to remain in his

personnel file for no more than a year[.]"); *Reshard v. Lahood*, No. 87-cv-2794, 2010 WL 1379806, at *17 (D.D.C. Apr. 7, 2010), *aff'd*, 443 F. App'x 568 (D.C. Cir. 2011) ("The letter further advised the plaintiff that '[a] copy of [the] reprimand [would] be filed in [her] official personnel folder for a period of one to three years, and may be removed after one year, at [the sender's] discretion.'"); *Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 303 (D.D.C. 2012) ("Herbert's letter of reprimand was to remain in his personnel file for no more than a year."); *cf., e.g.*, *Harper v. Potter*, 456 F. Supp. 2d 25, 29 (D.D.C. 2006) (holding "no reasonable employee would have been dissuaded" by a record of discipline that "remained part of [the plaintiff's] personnel record for the briefest of periods"). The Court thus finds that permanent OPF notations, like the one alleged by Mr. Heagney, *see* Compl. ¶ 46 ("ATF nonetheless decided to proceed with permanently (adversely) noting [Mr.] Heagney's file."), may be materially adverse.

*Second*, and relatedly, the Defendant argues that "the notation in [Mr.] Heagney's personnel file is indistinguishable from the kinds of actions that the D.C. Circuit has held are not materially adverse." Def.'s Mem. Supp. at 9. But none of the cases the Defendant cites makes any mention of a permanent—or even a temporary—change to an employee's OPF. *See Spence*, 109 F.4th at 540 ("Spence alleged the VA retaliated against her by sending letters of counseling and reprimand[.]"); *Baloch v. Kempthorne*, 550 F.3d 1191, 1195 (D.C. Cir. 2008) ("Loman issued 'letters of counseling' . . . and a 'letter of reprimand[.]'"); *Durant v. District of Columbia*, 875 F.3d 685, 691 (D.C. Cir. 2009) ("Durant's supervisor . . . issued Durant a 'Letter of Admonition' for 'specific deficiencies regarding [his] conduct and to warn [him] that future violations w[ould] result in corrective or adverse action."); *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) ("Hagans criticized Taylor for exhibiting 'negative behaviors.'"); *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002) (referring to "formal criticisms or reprimands" without mention of any

OPF); *Kline v. Ahuja*, No. 20-5220, 2021 WL 5537701, at *2 (D.C. Cir. Nov. 23, 2021) ("OPM issued Kline a counseling memorandum . . . [then] an official reprimand for failure to follow instructions[.]").

One case could be read as implying that permanence is of little import. *Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002), held that a negative report was not materially adverse even after it had been publicly reported, *see id.* at 1136—and reports are generally permanent once released to the public. But *Stewart* pre-dated *Burlington Northern* and applied a standard that has since been overruled. *See Stewart*, 276 F.3d at 1134 ("To establish an adverse personnel action in the absence of diminution of pay or benefits, plaintiff must show an action with 'materially adverse consequences affecting the terms, conditions, or privileges of employment.'" (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)); *Chambers v. District of Columbia*, 35 F.4th 870, 882 (D.C. Cir. 2022) ("For these reasons, we overrule *Brown*[.]"). The Defendant tries to minimize this fact by pointing to language in *Burlington Northern* that "agree[d] with the [standard] set forth by . . . the District of Columbia Circuit[.]" Def.'s Mem. Supp. at 9 n.2 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67). But that language referred to a precursor of the *Burlington Northern* standard that developed in the D.C. Circuit years after *Stewart* applied the *Brown* standard instead. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) ("We therefore agree with several other circuits that in order to support a claim of retaliation a plaintiff must demonstrate the employer's challenged action would have been material to a reasonable employee, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (cleaned up)). And it does not change the fact that the D.C. Circuit has expressly overruled the *Brown* standard relied upon in *Stewart*. *See Chambers*, 35 F.4th at 882.

### 3.    Causation

"To establish causation in a Title VII retaliation case against a federal employer, a plaintiff must prove that, but for her protected conduct, the employer would not have taken the adverse employment action of which she complains." *Heller v. Elkins*, 340 F. Supp. 3d 18, 29 (D.D.C. 2018) (cleaned up); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."). "At the motion to dismiss stage, the hurdle of alleging a causal link is not a high one." *Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 38 (D.D.C. 2018) (cleaned up). "Temporal proximity, for example, may suffice[.]" *Id.* (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012); *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007); *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003)). So "may other factual allegations that, construed in the light most favorable to the plaintiff, would 'plausibly' establish this element of the claim." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (citing *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of the Library of Congress v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013)); *see, e.g.*, *Ho*, 106 F.4th at 52–55 (collecting facts from the complaint "that together support an inference of causation"). Mr. Heagney alleges both.

*First*, Mr. Heagney alleges temporal proximity. He claims that he engaged in two separate protected activities: filing an EEO complaint on September 23, 2020, *see* Compl. ¶ 34 & n.8, and filing a Title VII lawsuit in federal court on August 4, 2022, *see id.* ¶¶ 43, 34 n.8. When a plaintiff has alleged multiple protected activities, "courts should consider [the] later protected activity in determining whether evidence of temporal proximity satisfies the causation element." *Hamilton*, 666 F.3d at 1358. For Mr. Heagney, that is the August 2022 federal lawsuit.

And according to the Complaint, ATF met to review the OIG report in September 2022 and notified Mr. Heagney of its plan to add the permanent notation to his OPF in October 2022. *See* Compl. ¶¶ 44–45. This two-month timeline fits within the outer bounds of what courts have recognized as being a sufficiently close temporal proximity. *See Ho*, 106 F.4th at 52 ("Although neither the Supreme Court nor this court has established a bright-line rule, the Supreme Court has cited circuit decisions suggesting that in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation." (cleaned up)).

The Defendant counters that Mr. Heagney "cannot establish a causal link" because the notation was the culmination of an investigation that began before either of the protected activities. Def.'s Mem. Supp. at 9–11 (arguing this as to the lawsuit); *see also* Def.'s Reply at 13 n.4 (extending the argument to the EEO activity). The Defendant first points to a broad principle from the Supreme Court and the D.C. Circuit teaching that "[e]mployers need not suspend previously planned [actions] upon discovering that [a protected activity] has [occurred], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Def.'s Mem. Supp. at 9 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam)) (citing *SaintPreux v. Mayorkas*, No. 21-5221, 2022 WL 1177328, at *1 (D.C. Cir. Apr. 14, 2022) (affirming there was no causation where "[u]ndisputed evidence demonstrates that appellee contemplated terminating appellant's employment months before appellant ever engaged in a protected activity")). The Defendant then argues that courts in this District have applied this principle in similar circumstances and ultimately "recognized that a plaintiff cannot show causation when the challenged action was the culmination of an investigation

or other process that began before he engaged in the protected activity." Def.'s Mem. Supp. at 10 (collecting cases). But the Court is not persuaded for a few reasons.

The first is that Mr. Heagney does not need to "establish" a causal link at the motion to dismiss stage. *Jones v. Castro*, 168 F. Supp. 3d 169, 184 (D.D.C. 2016) ("[A] plaintiff is not required to plead every fact necessary to establish a *prima facie* case to survive a motion to dismiss." (cleaned up)). All but one of the cases cited by the Defendant employed the summary judgment standard instead of the motion to dismiss standard. *See, e.g.*, *Clark Cnty. Sch. Dist.*, 532 U.S. at 269 (reversing a summary judgment reversal); *SaintPreux*, 2022 WL 1177328, at *1 (affirming summary judgment); *Clinton v. Granholm*, No. 18-cv-991, 2021 WL 1166737, at *1 (D.D.C. Mar. 26, 2021) (granting summary judgment); *Toomer v. Mattis*, 266 F. Supp. 3d 184, 203 (D.D.C. 2017) (holding no reasonable jury could reach the proffered conclusion); *Duncan v. WMATA*, 174 F. Supp. 3d 123, 124 (D.D.C. 2016) (granting summary judgment); *Blue v. Perciasepe*, 970 F. Supp. 2d 34, 39 (D.D.C. 2013) (granting summary judgment); *Moran v. U.S. Capitol Police Bd.*, 887 F. Supp. 2d 23, 26 (D.D.C. 2012) (granting summary judgment); *Robinson v. Duncan*, 775 F. Supp. 2d 143, 146 (D.D.C. 2011) (granting summary judgment); *Fox v. Giaccia*, 424 F. Supp. 2d 1, 2 (D.D.C. 2006) (granting summary judgment); *Bush v. Engleman*, 266 F. Supp. 2d 97, 98 (D.D.C. 2003) (granting summary judgment).

And this makes sense because those courts could rely on evidence or concessions to assess whether an employer had previously contemplated taking an adverse action. *See, e.g.*, *Clark Cnty. Sch. Dist.*, 532 U.S. at 272 ("The latter fact is immaterial in light of the fact that petitioner concededly was contemplating the transfer before it learned of the suit."); *SaintPreux*, 2022 WL 1177328, at *1 ("Undisputed evidence demonstrates that appellee contemplated terminating appellant's employment months before appellant ever engaged in a protected

activity[.]"); *Toomer*, 266 F. Supp. 3d at 203 (citing an email as evidence that a negative performance review "was already in the works"); *Duncan*, 174 F. Supp. 3d at 128 (concluding "the evidence in the record shows that there was no causal connection"); *Blue*, 970 F. Supp. 2d at 41 (citing a declaration as evidence that a superior began the termination process in a certain month); *Moran*, 887 F. Supp. 2d at 27–29 (citing exhibits to describe investigation timeline); *Robinson*, 775 F. Supp. 2d at 155 (citing a transcript "for the undisputed fact that Ms. Schagh began investigating plaintiff's performance . . . prior to plaintiff engaging in any protected EEO activity"); *Fox*, 424 F. Supp. at 9 (citing deposition as evidence that a superior "got the wheels in motion" to terminate a subordinate weeks before meeting with him); *Bush*, 266 F. Supp. 2d at 103 ("In this case, the uncontradicted record indicates that the decision to implement the transfer resulted from an independent review process that began months *before* plaintiff's EEO activity.").

The Defendant cites only one motion to dismiss case applying this principle: *Yee v. Garland*, No. 21-cv-1185, 2022 WL 2046112 (D.D.C. June 7, 2022). *See* Def.'s Mem. Supp. at 10. There, the court dismissed a retaliation claim because "[b]y the time [the] plaintiff [engaged in allegedly protected activity], she had already been investigated by [the Office of Professional Responsibility], charges had already been brought, and the [Professional Misconduct Review Unit] had already recommended sustaining two charges and imposing a ten-day suspension." *Yee*, 2022 WL 2046112 at *14. It knew this last fact because the movant had attached to the motion to dismiss an exhibit that seems to have been incorporated by reference. *See id.* at *3 (citing "Disciplinary Proposal"); Mot. Dismiss or Summ. J at 3., *Yee v. Garland*, No. 21-cv-1185 (D.D.C. June 7, 2022), ECF No. 4 (citing Exhibit 4 as the "Disciplinary Proposal"); *see also* Compl. ¶ 30, *Yee v. Garland*, No. 21-cv-1185 (D.D.C. June 7, 2022), ECF No. 1 (referencing the "disciplinary proposal"); *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may

consider a document that a complaint specifically references without converting the motion into one for summary judgment.").

But here, the record says nothing about ATF contemplating a notation before Mr. Heagney filed suit in federal court. To the contrary, the Complaint alleges that the ATF Professional Review Board met "to review the findings of the OIG Report of Investigation" only *after* Mr. Heagney filed his Title VII suit. Compl. ¶¶ 43–44. So there is no basis for the Court to conclude that temporal proximity cannot imply causation as a matter of law due to prior contemplation by the employer. *Cf. Fowler v. Gov't of D.C.*, No. 18-cv-634, 2020 WL 569995, at *1 (D.D.C. Feb. 5, 2020) ("They are incorrect, however, that the sufficiency of a complaint should be judged through the lens of what evidence might ultimately suffice to withstand a motion for summary judgment or to prevail at trial.").

The second reason the Court is not persuaded flows from its reading of the relevant case law. The Defendant cites several cases from this District for the proposition that "a plaintiff cannot show causation when the challenged action was the culmination of an investigation or other process that began before he engaged in the protected activity." Def.'s Mem. Supp. at 10 (collecting cases). But many of those cases dealt with employers who had been contemplating the specific adverse action before the plaintiff ever engaged in protected activity. *See, e.g.*, *Yee*, 2022 WL 2046112, at *14 ("PRMU had already recommended sustaining two charges and imposing a ten-day suspension."); *Toomer*, 266 F. Supp. 3d at 203 (saying the negative performance review "was already in the works before Ms. Toomer engaged in any protected activity"); *Blue*, 970 F. Supp. 2d at 45 ("Barnes commenced the termination process for Blue in *July* 2008, months before he first approached the Office of Civil Rights about his non-selection."); *Fox*, 424 F. Supp. 2d at 9 (saying superior "got the wheels in motion" for termination weeks before

meeting with the plaintiff). And other cases—including cases involving investigations—clarify that causation is foreclosed only insofar as it is based on temporal proximity. *See, e.g.*, *Clinton*, 2021 WL 1166737, at *10 (rejecting temporal evidence of causation because of the investigation timeline before assessing non-temporal evidence); *Beckford v. Geithner*, 661 F. Supp. 2d 17, 24 (D.D.C. 2009) ("The record reflects that Ms. Beckford's poor performance review was in progress before her complaint was filed, and thus, the proximity of those events cannot prove causality."); *Robinson*, 775 F. Supp. 2d at 156 ("Given such circumstances, the temporal proximity of plaintiff's EEO action and the Agency's adverse employment action do not rebut the Agency's legitimate proffer[.]"); *Bush*, 266 F. Supp. 2d at 103 ("In light of *Bredeen* and the facts present in this case, plaintiff's theory of temporal proximity cannot support an inference of causation."). Courts have even denied motions to dismiss where an employer's prior contemplation of the adverse action foreclosed causation by temporal proximity because the plaintiff had alleged separate facts that were probative of retaliation. *See, e.g.*, *Terveer v. Billington*, 34 F. Supp. 3d 100, 118–20 (D.D.C. 2014). So it is not quite right to say that "a plaintiff *cannot* show causation" when the adverse action is the product of a pre-existing investigation. Def.'s Mem. Supp. at 10 (emphasis added).

*Second*, Mr. Heagney alleges other facts that would plausibly establish causation. And this is sufficient even absent temporal proximity. *See, e.g.*, *Ho*, 106 F.4th at 52 ("Ho's complaint, however, does not rely solely on the timing of his non-selection in relation to his EEO complaints. He pled several other facts . . . that together support an inference of causation."); *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69–70 (D.C. Cir. 2015) ("We need not decide whether a five-month time lag without more would be sufficient to render Harris' claim plausible because his complaint alleged more.").

The first fact is that the Chair of the ATF's Professional Review Board—the Board that issued the notation proposal—had close relationships with individuals named in Mr. Heagney's lawsuit. *See* Pl.'s Opp'n at 26. More specifically, he was a "social friend" of then-Dallas Special Agent in Charge Jeff Boshek, who was a "target" of Mr. Heagney's previous lawsuit. Compl. ¶ 56. The Chair also met regularly with Thomas Chittum, the former Assistant Director for Field Operations, who was "the subject of ten mentions in [Mr. Heagney's] EEO suit" and "was aware [Mr.] Heagney was asserting wrongdoing by him." Compl. ¶ 55. While this alone might be insufficient to ultimately establish causation, it helps "nudge" Mr. Heagney's claims "across the line from conceivable to plausible." *Short*, 2024 WL 1213769, at *6 (cleaned up); *see, e.g.*, *Sims v. Sunovion Pharms., Inc.*, No. 17-cv-2519, 2019 WL 690343, at *10 (D.D.C. Feb. 19, 2019) (finding an allegation that the decisionmaker "had a personal and professional mentoring relationship" with someone in the plaintiff's EEOC complaint "sufficient to survive a motion to dismiss").

The second set of facts cast doubt on the Defendant's alleged belief that Mr. Heagney "engaged in serious wrongdoing." Compl. ¶ 64; *see, e.g.*, *Harris*, 791 F.3d at 69–70 (concluding causation was plausibly alleged in part because of arguments about pretext). Mr. Heagney alleges that no one from the searched apartment ever filed a formal complaint about the gun recovery effort. Compl. ¶ 60. And even though one of the suspects and his mother identified the other ATF Group Supervisor on the scene "as having engaged in misconduct toward the suspect," neither of them "identified [Mr.] Heagney has having mistreated the suspect or otherwise engaging in wrongdoing." *Id.* ¶ 59. Mr. Heagney also alleges a litany of positive reviews from co-workers and supervisors "even in periods overlapping the October 2018 investigation ATF is now alleging he mishandled." *Id.* ¶ 20; *see id.* ¶ 21. And finally, Mr. Heagney alleges that a different agent from

the same investigation was permitted to work at ATF even after OIG found that he had engaged in various unlawful acts related to the investigation. Compl. ¶ 62; *see infra*, at 29. Reading "the allegations of the complaint as a whole," *Ho*, 106 F.4th at 54 (cleaned up), the Court concludes that Mr. Heagney has stated a plausible claim, especially given the liberal pleading standard at this stage of the proceedings, *see Cavalier*, 306 F. Supp. 3d at 38 ("[T]he hurdle of alleging a causal link is not a high one."); *id.* ("It bears emphasis . . . that 'plausibility' is a less demanding standard than 'probability.'" (quoting *Iqbal*, 556 U.S. at 678)).

### C.    Evidentiary Claim

Mr. Heagney's fourth claim asks the Court to "reverse the notation to file action on the basis that the claims of misconduct/mishandling as to the gun theft/investigation/recovery were not supported by preponderance of the evidence." Compl. ¶ 69. The Parties seem to agree that this claim flows from 5 U.S.C. § 7701(c)(1)(B). *See* Def.'s Mem. Supp. at 19; Pl.'s Opp'n at 27. That provision says that "the decision of [an] agency shall be sustained . . . only if the agency's decision . . . is supported by a preponderance of the evidence," 5 U.S.C. § 7701(c)(1)(B). And it "plac[es] the burden of proof on the employing agency to justify its disciplinary action[.]" *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 8 (2001).

Nowhere in Mr. Heagney's Complaint does he provide details about OIG's conclusions. *See, e.g.*, Compl. ¶ 45 ("The PRB issues notice to [Mr.] Heagney of the intent to make a permanent notation to his file based on the conclusions of the DOJ OIG ROI."). Perhaps the closest he comes is when he says that "OIG would go [on] to claim that [an Assistant U.S. Attorney] identified [Mr.] Heagney as among those who engaged in misconduct and/or mishandled the investigation of the gun theft[.]" Compl. ¶ 28.1. But stating that a lawyer identified someone as having engaged in misconduct is not a finding that the individual actually did engage in misconduct. And even if

it were, this statement does not explain the misconduct identified in the report. The second closest statement is that "DOJ complained that there was no written search warrant for the October 2018 search of the suspect's apartment[.]" Compl. ¶ 58. But this does not clarify whether the complaint comes from the OIG investigation report, whether it applies to Mr. Heagney, or even whether the lack of warrant amounts to a Fourth Amendment violation. So the Court is once again in the dark as to the undisclosed conclusion of the OIG investigation.

Mr. Heagney minced no words when reporting on OIG's conclusions as to Agent Meade: that he had "intentionally obstructed justice and lacked candor . . . by providing false information as to his route stops and the location his firearm was stolen from"; that he had "taken part in an unconstitutional search and seizure of a residence by searching the home of a civilian without a search warrant or consent and seized evidence in violation of the 4th Amendment and ATF policies"; and that he had "left his . . . firearm, badge, and iPad unattended in a government-owned vehicle from which they were stolen," among other things. Compl. ¶ 62 (emphasis omitted). But Mr. Heagney failed to be as clear about OIG's findings as to his own conduct. By not even identifying the Defendant's findings, Mr. Heagney has failed to plausibly allege that those findings were not "supported by a preponderance of the evidence," 5 U.S.C. § 7701(c)(1)(B).

### D.    *Douglas* Factors Claim

Finally, Mr. Heagney claims that the notation "was the result of harmful procedural error in that the *Douglas* Factors were not applied." Compl. ¶ 68. These factors come from *Douglas v. Veterans Administration*, 5 MSPB 313 (1981). "In *Douglas*, the [MSPB] announced twelve factors relevant to determination of an appropriate penalty for a government employee's job-related misconduct, including: the nature and seriousness of the offense, the employee's job level, past work record, and past disciplinary record; likely effect of the offense on the employee's ability to

perform at a satisfactory level; consistency of proposed penalty with those imposed for similar offenses and with an applicable agency table of penalties; notoriety of the offense; impact on agency reputation; clarity of the rules violated; potential for employee rehabilitation; mitigating circumstances; and adequacy of alternative sanctions." *Amobi v. Dist. of Columbia Dep't of Corr.*, 755 F.3d 980, 987 n.4 (D.C. Cir. 2014). "[A]n agency must 'conscientiously consider the relevant [*Douglas*] factors and . . . strike a responsible balance within tolerable levels of reasonableness." *Id.* (quoting *Stokes v. District of Columbia*, 502 A.2d 1006, 1011 (D.C. 1985)).

Mr. Heagney makes only one allegation to support this claim: "that the *Douglas* Factors were not applied." Compl. ¶ 68. This is a threadbare and conclusory statement that is insufficient to survive a motion to dismiss. *See, e.g.*, *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 704–06, 711 (5th Cir. 2017) (finding plaintiffs did not plausibly state a claim in part because allegations that a certain factor "was not considered" were "not facts and are no more than formulaic recitations of the elements of a cause of action" (cleaned up)); *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 682 (3d Cir. 2023) (dismissing claim where the amended complaint failed to "provide facts showing that [the defendant] did not generally consider a variety of factors"). The Court therefore dismisses this claim.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the Defendant's Motion to Dismiss, ECF No. 10, as to Claims 1, 2, 3, 4, and 7, and DENIES the Defendant's Motion to Dismiss, *id.*, as to Claims 5 and 6.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   May 22, 2025