**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCOTT L. HEAGNEY,<br>*Plaintiff*,<br>v.<br>TODD BLANCHE,[1]<br>*Defendant*. | Civil Action No. 24 - 2592 (SLS)<br>Judge Sparkle L. Sooknanan<br>**UNDER SEAL** |

**MEMORANDUM OPINION**

Scott L. Heagney spent more than twenty years as a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). More than a year after he retired, ATF placed a permanent adverse notation in his official personnel file for his role in an unconstitutional, warrantless search to recover another agent's stolen firearm. Mr. Heagney brought this suit to challenge that notation under various federal statutes. Two categories of claims survived the pleading stage: (1) two retaliation claims under Title VII of the Civil Rights Act of 1964, and (2) a procedural claim under 5 U.S.C. § 3322. The Defendant now moves for summary judgment on those remaining claims. On this fully developed record, no reasonable jury could find that ATF imposed the notation in retaliation for protected activity, and Mr. Heagney has not established any prejudice from the procedural violations. The Court therefore grants the Defendant's motion for summary judgment.

[1] The current Attorney General is substituted for his predecessor pursuant to Federal Rule of Civil Procedure 25(d).

## BACKGROUND

### A. Factual Background

The Court draws the facts from the Parties' Joint Statement of Undisputed Facts and the underlying record. *See* Joint Statement of Undisputed Facts (JSF), ECF No. 63; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Pl.'s SMF), ECF No. 61-2; Def.'s Resp. to Pl.'s Additional Material Facts (Def.'s Resp. SMF), ECF No. 62-1. The Court assumes the facts in those statements to be true unless they have been specifically disputed, and it assumes the truth of other undisputed statements in the record. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[2]

This case has a long and tortured history—encompassing several concurrent government investigations, repeated cycles of protected activity and alleged reprisal, and an already-settled lawsuit. The Court's two prior opinions and the Parties' settlement have significantly narrowed the issues left to be resolved. What remains are challenges to a permanent notation that ATF placed in Mr. Heagney's personnel file after he retired. Mr. Heagney alleges that the notation was both impermissible reprisal for filing a Title VII lawsuit in Texas and procedurally improper. Because the path that led to the Texas lawsuit and the subsequent notation are relevant to Mr. Heagney's remaining claims, the Court recounts that history in some detail.

#### 1. The Gun Incident and OIG Report

Mr. Heagney worked as a special agent with ATF for more than twenty years before his retirement. JSF ¶¶ 1, 6. In October 2018, Mr. Heagney's coworker, Daniel Meade, reported that his service firearm had been stolen. JSF ¶ 7. In an effort to recover the firearm, ATF agents conducted a warrantless search of a private residence in Mesquite, Texas. JSF ¶¶ 8, 9. Mr. Heagney

---

[2] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

was present at that search, and during the operation, Mr. Heagney "grabbed [the handcuffed suspect] by the collar," "held him there for a few seconds," and "kind of shook him a little bit." JSF ¶ 51; *see also* Report of Investigation (ROI), at 1721, 1765, Def.'s Ex. G, ECF No. 60. ATF agents later purchased the gun at a flea market. JSF ¶ 11.

In January 2019, the Justice Department's Office of the Inspector General (OIG) announced that it would investigate the incident. JSF ¶ 13. OIG began its investigation that March. *Id.* ¶¶ 14, 21. For reasons not entirely clear on this record, the investigation was rather sluggish. OIG did not interview Mr. Heagney until April 2021, JSF ¶ 23, took until November 2021 to finish its final report, JSF ¶ 25, and did not make ATF aware of the report until April 2022, JSF ¶ 30.

### 2. EEO Activity, Reassignment, and Retirement

While the OIG investigation into the warrantless search was underway, Mr. Heagney became embroiled in a separate dispute with ATF. In June 2020, Mr. Heagney provided a statement supporting a female agent's Equal Employment Opportunity (EEO) complaint. Def.'s Mem. Supp. Summ. J. (Mot.) at 4 n.2, ECF No. 59-1; JSF ¶ 17. Two months later, on August 19, ATF informed Mr. Heagney that he would be reassigned from Dallas to a position at ATF headquarters in Washington, D.C. JSF ¶ 18. Believing that the reassignment was retaliation for his EEO activity, Mr. Heagney filed his own administrative EEO complaint on September 23, 2020. JSF ¶¶ 19, 24.

On November 17, 2021, ATF ordered Mr. Heagney to report in person to the job in Washington, D.C. effective February 13, 2022. JSF ¶ 20. The next month, Mr. Heagney submitted a request to retire, which became effective February 21, 2022. Pl.'s Ex. P2 (E.D. Tex. Compl.) ¶ 71, ECF No. 61-5; JSF ¶ 29. He claims that the reassignment left him no choice but to retire.

E.D. Tex. Compl. ¶ 72. As of his retirement, no discipline arising from the OIG investigation had been proposed against Mr. Heagney. JSF ¶ 28.

On August 4, 2022, Mr. Heagney filed a Title VII suit in the Eastern District of Texas, JSF ¶ 52, alleging that ATF reassigned him and forced him to retire in reprisal for his submitting a statement supporting the female colleague's EEO complaint. E.D. Tex. Compl. ¶¶ 46, 52–55, 81–88, 98–99. The lawsuit accused Jeff Boshek, the Special Agent in Charge of ATF's Dallas office, and Thomas Chittum, an ATF Assistant Director, of offering shifting and unfounded justifications for the reassignment. *Id.*

**3. ATF's Review and Notation**

Meanwhile, it turns out that OIG completed its investigation into the gun-recovery incident and transmitted its Report of Investigation to ATF on November 19, 2021—just days before ATF ordered Mr. Heagney to report to his new assignment. JSF ¶ 25. For reasons not clear on this record, ATF's Internal Affairs Division did not learn that OIG had completed its report until many months later in April 2022. JSF ¶ 30; *see* Def.'s Resp. SMF ¶¶ 32–33; Jackson Dep. at 14:9–11, Pl.'s Ex. P3, ECF No. 61-6. On May 26, 2022, an ATF Assistant Director signed a referral memorandum forwarding the report to Richard Coes, the Chair of ATF's Professional Review Board (Board). JSF ¶ 31; ROI at 2. The report was transmitted to the Board in June 2022 and was slated for review at the Board's September meeting. JSF ¶¶ 32–33.

The report named Mr. Meade—the ATF agent whose firearm was stolen—as the primary subject and Mr. Heagney, Supervisory Special Agent Joseph Patterson, and two other agents as "[a]dditional [s]ubjects." JSF ¶ 22; ROI at 4, 8. OIG substantiated allegations that Mr. Heagney had participated in an unconstitutional search and seizure, may have assaulted a suspect in custody, improperly used agent cashier funds, and failed to supervise his team. ROI at 5. It also found that

Mr. Meade had participated in the unconstitutional search and seizure and had "intentionally obstructed justice and lacked candor." JSF ¶ 26.

On September 8, 2022, about a month after Mr. Heagney filed his Texas Title VII lawsuit, the Professional Review Board met and decided to propose a permanent notation about the OIG Report in Mr. Heagney's personnel file. JSF ¶ 34; Coes Dep. at 7:16–24, Def.'s Ex. M, ECF No. 60. Mr. Coes, the Board's chair, later testified that he was unaware of Mr. Heagney's lawsuit at the time of this decision. Coes Dep. at 15:15–21.

On October 24, 2022, Mr. Coes issued a notice informing Mr. Heagney that the Board proposed placing a permanent notation in his personnel file under 5 U.S.C. § 3322. Def.'s Ex. A at 1–3, ECF No. 60. The notice was sent the next day, eight months after Mr. Heagney retired and eleven months after OIG completed its report. JSF ¶¶ 36–37. It proposed five adverse findings: that Mr. Heagney had (1) "conducted or authorized a search of a private residence without a search warrant or proper consent in violation of the United States Constitution"; (2) "conducted or authorized" an unconstitutional seizure of property from that residence; (3) "made inappropriate physical contact with a suspect in ATF's custody"; (4) failed to supervise the recovery operation; and (5) improperly used agent cashier funds. Def.'s Ex. A at 2.

After receiving several extensions to respond to the notice, largely to accommodate settlement negotiations in the Texas suit, Mr. Heagney submitted a written response challenging each proposed finding. JSF ¶¶ 40–41. In June 2023, the Bureau Deciding Official, John Schmidt, sustained three of the five proposed findings: the warrantless search, the property seizure, and the inappropriate physical contact. JSF ¶¶ 47–49. He determined that Mr. Heagney was "substantially involved in the incidents" and "failed to take appropriate actions to prevent the misconduct or mitigate the impact." Def.'s Ex. F at 3, ECF No. 60. But Mr. Schmidt declined to sustain the

cashier-funds finding because Mr. Heagney "was not a participant" in buying back the firearm, and he declined to sustain the supervision finding, deeming it duplicative. Schmidt Dep. at 30:1–22, Def.'s Ex. L, ECF No. 60. ATF then placed the notation in Mr. Heagney's personnel file "on either June 14, 2023 or July 14, 2023." JSF ¶ 50.

Mr. Heagney appealed the notation to the Merit Systems Protection Board (MSPB). JSF ¶ 54. While that appeal was pending, the Parties reached a settlement in the Texas suit, but their settlement agreement "specifically carved out the notation to file and [Mr. Heagney's] challenge of it before the MSPB as unresolved." JSF ¶¶ 55–56. When the MSPB did not issue a decision within 120 days, Mr. Heagney filed this suit. *See* Mot. at 5.

**B. Procedural Background**

On September 9, 2024, Mr. Heagney filed a Complaint in this Court, alleging violations of multiple federal statutes. *See* Compl. ¶¶ 65–75, ECF No. 1. On January 10, 2025, the Defendant moved to dismiss Mr. Heagney's claims under Federal Rule of Civil Procedure 12(b)(6). Def.'s Mot. Dismiss at 1, ECF No. 10; *see also* Pl.'s Opp'n Mot. Dismiss, ECF No. 14; Def.'s Reply Mot. Dismiss, ECF No. 16. The Court dismissed all of Mr. Heagney's claims except his Title VII retaliation claims. *See* Mem. Op. at 31, ECF No. 17. Mr. Heagney moved for partial reconsideration, *see* Mot. Reconsideration, ECF No. 21, and after the Government conceded that ATF had entered the notation pursuant to Section 3322, the Court reinstated his claim that ATF committed harmful procedural error by missing the statute's deadlines. *See* Mem. Op. at 9–17, ECF No. 31. Mr. Heagney then filed an Amended Complaint, ECF No. 56, and after discovery, the Defendant moved for summary judgment on the remaining claims: harmful procedural error (Count II) and retaliation (Counts V and VI). Def.'s Mot. Summ. J. at 1, ECF No. 59. The

Defendant's motion is fully briefed and ripe for review. *See* Pl.'s Opp'n Summ. J. (Opp'n), ECF No. 61-1; Def.'s Reply to Opp'n Summ. J. (Reply), ECF No. 62.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To defeat summary judgment, the nonmovant must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (cleaned up). In considering a motion for summary judgment, a court "may not make credibility determinations or otherwise weigh the evidence." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016). Instead, it must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* Summary judgment is appropriate only if, viewing the evidence in that light, the court concludes that no reasonable jury could find for the nonmovant. *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018).

## DISCUSSION

Mr. Heagney's remaining claims raise two issues: (1) whether a reasonable jury could find that ATF imposed the notation in retaliation for his August 2022 Title VII lawsuit; and (2) whether ATF's failure to meet the deadlines in 5 U.S.C. § 3322 amounted to harmful procedural error. The Court concludes that the Defendant is entitled to summary judgment on both issues.

### A. Retaliation

The Court first addresses Mr. Heagney's claims that ATF imposed the notation in retaliation for his protected activity. It concludes that no reasonable jury could find that retaliation played a role in the decision to place a notation in Mr. Heagney's file.

Title VII prohibits employer actions that discriminate against an employee because the employee has "made a charge, testified, assisted, or participated in any manner" in a Title VII "investigation, proceeding, or hearing[.]" 42 U.S.C. § 2000e-3(a). Title VII retaliation claims based on circumstantial evidence are governed by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Geleta v. Gray*, 645 F.3d 408, 410 (D.C. Cir. 2011). To establish a prima facie case of retaliation, a plaintiff must show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for taking the adverse employment action. *See id.*

But the D.C. Circuit has instructed that once the employer has asserted a legitimate, nondiscriminatory reason for its decision, the district court should skip the "unnecessary sideshow" of whether the plaintiff made out a prima facie case. *Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Jeffries v. Barr*, 965 F.3d 843, 860 (D.C. Cir. 2020) (applying the *Brady* standard to a Title VII retaliation claim). Instead, the court must determine whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted reason was pretextual and that the employer actually retaliated against the employee in response to protected activity. *See Brady*, 520 F.3d at 494; *Jones*, 557 F.3d at 678 ("Given that the Board asserted its legitimate non-retaliatory explanation . . . the district court should have proceeded to the ultimate issue of retaliation *vel non* . . . .").

Here, ATF has supplied a legitimate, nonretaliatory explanation for the notation: Mr. Heagney's role in an unconstitutional warrantless search, an unconstitutional property seizure, and inappropriate physical contact with a suspect. JSF ¶¶ 47–49; Def.'s Ex. F at 3. The Court thus

proceeds directly to the ultimate question of whether Mr. Heagney has offered sufficient evidence, considered as a whole and with all reasonable inferences drawn in his favor, for a reasonable jury to find that ATF's reason was pretext for retaliation.

In determining whether a reasonable jury could infer retaliation, the Court reviews "all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Jones*, 557 F.3d at 677. Evidence that the employer's stated reason for the adverse action was pretextual may include:

> the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Jeffries*, 965 F.3d at 860 (cleaned up).

Mr. Heagney relies on four categories of evidence to meet his burden: (1) temporal proximity; (2) professional and social connections between officials who imposed the notation and those allegedly "embarrassed" by Mr. Heagney's Texas lawsuit; (3) investigative and procedural irregularities, including an attribution error in the OIG Report; and (4) comparator evidence that Mr. Meade was treated more favorably. Opp'n at 27–36. The Court addresses each in turn and then considers the record as a whole.

**1. Temporal Proximity**

First, Mr. Heagney argues that the timing of the Professional Review Board's actions supports an inference of pretext. Opp'n at 28. Mr. Heagney filed the Texas suit on August 4, 2022. JSF ¶ 52. The Board met 35 days later, on September 8, and proposed the notation on October 25, 82 days after the suit. JSF ¶¶ 34–36, 52. Although this temporal proximity supported his claim at

the pleading stage, Mem. Op. at 23–25, ECF No. 17, it does not, without more, rebut ATF's legitimate explanation at summary judgment. Timing alone may establish a prima facie case, but overcoming an employer's legitimate explanation at summary judgment "requires positive evidence beyond mere proximity." *See Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020) (cleaned up). The record now shows that the post-lawsuit actions were part of a multistep notation process already in the works *before* Mr. Heagney filed the lawsuit.

The emails produced in discovery show a disciplinary process underway well before the Texas suit. ATF referred the OIG Report to the Professional Review Board on May 26, 2022. JSF ¶ 31. ATF's Internal Affairs Division then uploaded it to the Board's shared drive on June 21, in the folder for the Board's July meeting. *Id.* ¶¶ 32–33; Def.'s Ex. N (emails) at 3, ECF No. 60. Internal Affairs followed up with the Board on July 12, and the Board's Deputy Chair, Stephanie Lyles, responded that she and Mr. Coes, the Board's Chair, "spoke about [the report] in consultation with counsel" in June, and that she had moved the file to an administrative drive "until [they] were notified that it was a go for the [Professional Review Board]'s review." Def.'s Ex. N at 2. Internal Affairs wrote back, confirming "it is good to go." *Id.* at 1; JSF ¶ 33. Ms. Lyles then moved the file into the August folder and slotted it for review at the Board's September meeting. Def.'s Ex. N at 1; JSF ¶ 33.

In his deposition, Mr. Coes attributed the interval between the May referral and the September meeting to the Board's caseload: "[O]ftentimes when there's a lag like that, it's based on caseload. So there's a good chance that that's where it fell in the queue as far as cases to be heard, in addition to the fact, if I'm not mistaken, this case was nearly 2,000 pages." Coes Dep. at 9:10–20. Mr. Coes further testified that when the Board met in September and decided to propose the notation, he did not know that Mr. Heagney had filed the Texas suit. *Id.* at 15:15–21.

Taken together, this evidence does not support a reasonable inference that the timing reflects a retaliatory motive rather than the slow churn of bureaucracy.

*Clark County School District v. Breeden* is instructive. 532 U.S. 268, 272 (2001) (per curiam). In evaluating a Title VII retaliation claim at the summary-judgment stage, the Supreme Court held that the temporal proximity was "immaterial in light of the fact that petitioner concededly was contemplating the transfer before it learned of the suit." *Id.* at 272. As the Court put it: "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id.* Here, too, the Board was "proceeding along lines previously contemplated[.]" *Id.* ATF referred the investigative report to the Board in May 2022, transmitted it in June, and had slotted it for review at the September meeting by mid-July—all before Mr. Heagney filed suit. JSF ¶¶ 31–33; Def.'s Ex. N at 1–3. Mr. Heagney characterizes those steps as merely a "plan to plan," emphasizing that the Board had not yet decided whether to propose a notation. Opp'n at 28. But an employer's course of action need not have been "definitively determined" before the protected activity. *Breeden*, 532 U.S. at 272. The fact that the Board met and proposed the notation after the lawsuit does not, without more, support an inference that the lawsuit was the reason for those actions. *See Durant v. District of Columbia*, 875 F.3d 685, 700 (D.C. Cir. 2017) (affirming summary judgment to the employer on a retaliation claim because the plaintiff offered no "positive evidence beyond mere proximity" undermining the employer's legitimate explanation).

Viewed in context, Mr. Heagney's temporal-proximity evidence does not create a material dispute about whether ATF's explanation was pretext for retaliation.

### 2. Social Connections Among the Decisionmakers

Next, Mr. Heagney argues that what he calls the "[w]eb of [r]elationships" among ATF's senior officials supports an inference of pretext. Opp'n at 31. His theory goes like this. The officials who proposed and approved the notation, Mr. Coes and Mr. Schmidt, had professional and social ties to the two officials criticized in his Texas suit, Mr. Boshek and Mr. Chittum, and those ties led them to pursue the notation as "reprisal for a suit embarrassing those two ATF management officials . . . and the agency for which they all worked." *Id.* at 32. But here too, the tenuous connections that Mr. Heagney identifies do not create a genuine dispute about pretext.

Mr. Heagney relies on the following ties. Opp'n at 29, 31–36.

- Mr. Boshek chaired the Professional Review Board immediately before he became Special Agent in Charge in Dallas. Def.'s Resp. SMF ¶ 48.
- Mr. Coes testified that he and Mr. Boshek "attended the same college" and that they had interacted within a year of his deposition about "probably something non-work related." Coes Dep. at 7:7–15.
- While Mr. Chittum was acting Deputy Director, Mr. Coes went to him after Board meetings to discuss what the Board had done. *Id.* at 6:9–25.
- Mr. Schmidt briefed the Deputy Director monthly on decided cases and met quarterly with the Board Chair and the head of Internal Affairs to review them. Schmidt Dep. at 48:22–49:21.
- George Lauder, the Assistant Director for Field Operations at the time that office received a copy of the referral, knows Mr. Boshek from work, shares an alma mater with him, has socialized with him and Mr. Coes at ATF events, oversaw Mr. Boshek's work as Assistant Director, and once reported to Mr. Chittum. Def.'s

Resp. SMF ¶¶ 43, 45–47; Lauder Dep. at 6:19–7:21, 10:1–11, 12:19–21, Pl.'s Ex. P5, ECF No. 61-8.

- Theron Jackson, who headed Internal Affairs when the OIG report was referred, knew Mr. Chittum as a colleague and thought he might have exchanged emails with Mr. Boshek in the month before his deposition. Jackson Dep. at 17:6–10, 18:16–22; *see* Opp'n at 33–34.

As Mr. Heagney sees it, "[t]ies of that kind give the decisionmakers a personal stake in the reputations of the men Plaintiff named in his suit[.]" Opp'n at 34. Mr. Heagney's theory apparently is that some deep-seated loyalty to one's alma mater and an occasional conversation drove Mr. Coes or Mr. Schmidt to retaliate against Mr. Heagney for a lawsuit criticizing their colleagues (and perhaps, friends). This is a tall tale. Mr. Heagney identifies nothing beyond the connections themselves, which are not out of the ordinary for professionals working in the same field. Nothing in the record suggests that Mr. Boshek or Mr. Chittum asked for, recommended, or otherwise influenced the notation. *See Vickers v. Powell*, 493 F.3d 186, 196 (D.C. Cir. 2007) (affirming summary judgment where the plaintiff "failed to put on any evidence" that the deciding official's decision "was in any way influenced by" the official who was the focus of her discrimination complaints). And Mr. Coes and Mr. Schmidt each testified to never having communicated with Mr. Boshek about Mr. Heagney. Coes Dep. at 7:4–6; Schmidt Dep. at 47:17–19. Taken together, Mr. Heagney's theory regarding social and professional connections is unavailing.

Mr. Heagney also briefly invokes the "cat's-paw" theory, Opp'n at 29, 35–36, under which "a formal decision maker may be an unwitting conduit of another actor's illicit motives." *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). Seemingly grasping at straws, Mr. Heagney points in the direction of Mr. Boshek—noting that he communicated with investigators and

arranged access to evidence in 2018 and 2019. Opp'n at 35–36. But those contacts predate both Mr. Heagney's September 2020 EEO complaint and his August 2022 suit. And the cited records concerned the logistics of the investigation into Mr. Meade, not Mr. Heagney. ROI at 34; Def.'s Ex. O at 2, ECF No. 60. Because Mr. Heagney fails to identify any later involvement or any specific influence by Mr. Boshek in the referral, the Board's proposal, or Mr. Schmidt's decision, his theory fails. *See Ransom v. McDonald*, 211 F. Supp. 3d 122, 128 (D.D.C. 2016) (rejecting as "a bridge too far" an attempt to impute one official's retaliatory motive to the deciding official where the evidence established only routine communications of the sort occurring "a thousand times a day"), *aff'd sub nom. Ransom v. Shulkin*, 719 F. App'x 8 (D.C. Cir. 2018).

Mr. Heagney acknowledges that it is not a "sin to have friends at work" but insists that "connections cannot be ignored when it comes to gauging motive." Opp'n at 34. Perhaps the relationships could support an inference of reprisal if combined with other evidence of pretext. But they do not, by themselves, establish a genuine dispute about pretext.

**3. Flaws in the Investigation**

Mr. Heagney next argues that OIG's Report of Investigation was flawed and that ATF relied on findings controverted by the relevant evidence. Opp'n at 29–30. A materially flawed investigation can support an inference of pretext. *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296–99 (D.C. Cir. 2015) ("A reasonable jury can conclude that an employer's reason were pretextual . . . if a plaintiff can show that an employer's investigation . . . was not just flawed but inexplicably unfair." (cleaned up)). But an investigation need not be flawless. The basic question is whether the employer "*honestly and reasonably believed*" that the misconduct occurred. *Brady*, 520 F.3d at 496. Therefore, errors in an investigative report do not, without more, establish pretext,

because an employer may act on a "reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005).

The errors that Mr. Heagney identifies fall far short of his burden to create a triable issue of fact on pretext. Mr. Heagney first points to an attribution error in the OIG report. The report's synopsis states that [redacted] "alleged that . . . Patterson . . . and . . . Heagney initiated an investigation to recover Meade's stolen firearm; however, [they] failed to conduct it judiciously." ROI at 4. [redacted] has since declared under penalty of perjury that she made that assertion about Mr. Patterson, not Mr. Heagney, and that she is "unaware of any actions that Scott Heagney improperly did or failed to do[.]" Pl.'s Ex. P1 at 2–4, ECF No. 61-4. Although this was assuredly an attribution error in the report, it does not raise a genuine dispute about pretext. [redacted] was not a witness to the events at the apartment, and the report's findings did not rise or fall on her account. Furthermore, when Mr. Schmidt reviewed the entire file in determining whether to impose a notation, he considered countervailing evidence. [redacted] 2018 interview, in which she described Mr. Heagney as the supervisor who asked for reports, was in the file, Def.'s Ex. H at 53, 61, ECF No. 60, and Mr. Schmidt's decision letter expressly acknowledged Mr. Heagney's claim that [redacted] "did not claim any misconduct or mismanagement on [his] part," Def.'s Ex. F at 2.

A minor mistake like this one neither calls the entire investigation into question nor requires the agency to disregard all other evidence in the record. Here, the agency rested its findings on the wealth of independent evidence in the report. Mr. Heagney admitted that he "grabbed [the suspect] by the collar," "held him there for a few seconds," and "kind of shook him a little bit" while the suspect sat handcuffed in the back seat of a government vehicle. JSF ¶ 51. And the Parties have stipulated that the contact was inappropriate. JSF ¶ 9. In his decision letter,

Mr. Schmidt found it "undisputed in the record" that the agency had no warrant or proper consent, that property was seized, and that Mr. Heagney grabbed the suspect. Def.'s Ex. F at 3. Mr. Schmidt thus based his decision on undisputed, independent evidence.

Mr. Heagney's also contends that some aspects of the underlying incident remain disputed. But the Court is not adjudicating that underlying incident—it is determining whether that incident (as opposed to an unlawful motivation) was the basis for ATF's adverse decision. As the D.C. Circuit has explained, for purposes of a retaliation claim, "[t]he question is not whether the underlying . . . incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incident occurred." *Brady*, 520 F.3d at 496. And the record shows just that: Mr. Schmidt rejected two of the five proposed findings, suggesting that he impartially weighed the evidence and reached independent conclusions rather than blindly adopting the proposal or adopting it out of reprisal. Schmidt Dep. at 30:6–22; JSF ¶¶ 47–49. Mr. Schmidt also testified that he was aware of Mr. Heagney's EEO complaint and lawsuit but that they "had no effect on [him]." Schmidt Dep. at 50:1–11. *See Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.").

Taken together, the attribution error and the disputed accounts do not permit a reasonable inference that the three sustained findings were pretext for retaliation.

**4. Comparator Evidence**

Finally, Mr. Heagney's comparator evidence fares no better. Evidence that similarly situated employees who did not engage in protected activity were treated "more favorably in the same factual circumstances" may support an inference that the employer acted for an unlawful reason. *Brady*, 520 F.3d at 495. To raise that inference, however, the plaintiff must "demonstrate

that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [comparator]' employee." *Burley*, 801 F.3d at 301 (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301).

Mr. Heagney argues that Special Agent Daniel Meade was a comparator who received more favorable treatment. Mr. Heagney emphasizes that although OIG also substantiated misconduct by Mr. Meade in the same investigation, Mr. Meade remained employed at ATF after the OIG report issued. Opp'n at 30–31; JSF ¶¶ 26–27. Mr. Meade, however, is not a valid comparator for two reasons. First, as Mr. Heagney acknowledges, "[Mr. Heagney] was a supervisor and Meade was not[.]" Opp'n at 30. Their distinct roles figured in the disciplinary process: Mr. Schmidt sustained findings against Mr. Heagney because, "in [his] role as a supervisor," he was "substantially involved in the incidents" and "failed to take appropriate actions to prevent the misconduct or mitigate the impact." Def.'s Ex. F at 3. In *Burley*, the D.C. Circuit rejected a comparison between employees involved in the same incident because the two "had different roles and, consequently, bore different responsibility[.]" 801 F.3d at 301; *see also Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1174–75 (D.C. Cir. 2021) (holding that the plaintiff's "non-supervisory comparators are too dissimilar to draw any inference of discriminatory treatment" because "supervisors are entrusted with greater authority than officers, held to a higher standard, and disciplined more severely than officers for similar violations").

Second, Mr. Heagney retired before ATF proposed the notation, while Mr. Meade was disciplined as a current employee. JSF ¶¶ 27–29, 36. The Section 3322 notation process that

Mr. Heagney challenges applies only to employees who leave the agency before an investigation is resolved. Because Mr. Meade was subject to a different disciplinary procedure altogether (the one applying to current employees), the Court cannot accurately compare the two outcomes. *See Burley*, 801 F.3d at 301–02 (holding that comparator evidence does not support an inference of pretext where material differences in the employees' conduct, responsibilities, and employment situation defeat the comparison).

The more apt comparator is Joseph Patterson, the other supervisor at the operation. Like Mr. Heagney, Mr. Patterson left ATF before discipline was proposed and went through the same Section 3322 process before the same deciding official. Schmidt Dep. at 6:18–7:18. The two supervisors faced "the exact same charges[,]" which Mr. Schmidt "looked at . . . independently of each other." *Id.* at 8:8–15. And like Mr. Heagney, Mr. Patterson received a permanent notation in his personnel file. *Id.* at 15:3–4. In fact, while Mr. Schmidt sustained only three of the five findings against Mr. Heagney, he sustained all five against Mr. Patterson. *Id.* at 7:19–8:19, 15:1–4; JSF ¶ 48. If anything, then, ATF treated Mr. Heagney more favorably than a similarly situated employee. So Mr. Heagney's comparator evidence does not rescue his claim.

* * *

Having examined each category of evidence, the Court now asks whether all the evidence "in combination provide sufficient evidence for a reasonable jury to infer retaliation." *Jones*, 557 F.3d at 679 (cleaned up). It does not. On this record, the Court concludes that the notation in Mr. Heagney's file was the result of a multi-year administrative process and was based on conduct that Mr. Heagney admits. And any web of social relationships between the agency officials at issue is simply too attenuated to create a genuine dispute of material fact warranting a jury trial. Moreover, Mr. Schmidt's decision to impose the notation rested on conduct that Mr. Heagney

admits, and ATF placed a similar permanent notation—backed by similar findings—in another former supervisor's file. The Defendant is therefore entitled to summary judgment on the retaliation claims (Counts V and VI).

**B. Harmful Procedural Error**

The Court now addresses Mr. Heagney's claim that ATF committed harmful procedural error by missing two deadlines in 5 U.S.C. § 3322. Opp'n at 17–20. The Court concludes that ATF missed both deadlines, but that Mr. Heagney has not shown any harm from the errors. The Government is therefore entitled to summary judgment on this claim as well.

Starting with a brief recap of the procedural history, Mr. Heagney brought three claims under Section 3322. *See generally* Compl. The Court dismissed all three. Mem. Op. at 31, ECF No. 17. Mr. Heagney then moved for reconsideration of those claims. Mot. Reconsideration at 10–11. After the Government conceded that ATF entered the notation under Section 3322, the Court held that Mr. Heagney had plausibly alleged that ATF missed the statute's 5-day notice deadline and 40-day notation deadline, that those deadlines are mandatory, and that the delay plausibly changed the outcome by allowing ATF to respond to the Texas suit. Mem. Op. at 13–17, ECF No. 31. The Court, however, left in place its dismissal of Mr. Heagney's claim that ATF acted "not in accordance with law," *id.* at 4–8, and his request for a declaratory judgment, *id.* at 17–18. The Court now considers the procedural-error claim in light of the summary judgment record.

At the outset, the Court dispenses with the Defendant's renewed argument that the deadlines are not mandatory. The Court has already explained that they are. *See* Mem. Op. at 15–16, ECF No. 31 (concluding that "Section 3322's deadlines are mandatory"). That being said, a mandatory deadline does not automatically create a right to relief. Mr. Heagney's remaining Section 3322 claim arises under 5 U.S.C. § 7701(c)(2)(A), which provides that "the agency's

decision may not be sustained . . . if the employee . . . shows *harmful error* in the application of the agency's procedures in arriving at such decision." *Id.* (emphasis added). Mr. Heagney must therefore show both that ATF violated Section 3322 and that the violation was harmful.

**1. Whether ATF Violated Section 3322**

Section 3322 establishes procedures for placing an adverse notation in the personnel file of an employee who resigns or retires before a personnel investigation is resolved. The statute imposes two deadlines relevant here. First, "[p]rior to making a permanent notation in an employee's official personnel record file under subsection (a), the head of the agency shall . . . notify the employee in writing within five days of the resolution of the investigation and provide such employee a copy of the adverse finding and any supporting documentation[.]" 5 U.S.C. § 3322(b)(1). Second, Subsection 3322(a) requires that the agency head "make such notation not later than 40 days after the date of the resolution of such investigation." *Id.* § 3322(a). Thus, once the investigation was resolved, ATF had to notify Mr. Heagney within 5 days and enter the notation within 40 days.

The Parties agree that ATF sent Mr. Heagney notice of the proposed notation on October 25, 2022, JSF ¶ 36, and entered the notation "on either June 14, 2023 or July 14, 2023," JSF ¶ 50. But they dispute when the investigation was *resolved* for purposes of Section 3322. Mr. Heagney argues that the investigation was resolved on November 19, 2021, when OIG completed its Report of Investigation and transmitted it to ATF. Opp'n at 18–19; JSF ¶ 25. The Government urges the Court to treat May 26, 2022—the date that ATF's Assistant Director approved the ATF Report of Investigation and referred Mr. Heagney to the Board—as the relevant date. Mot. at 13; Reply at 2–7. But that quibble is essentially irrelevant—even under the Government's proposed date of May 26, 2022, ATF missed both deadlines by a wide margin. ATF did not notify Mr. Heagney until

October 25, 2022, months after the 5-day deadline had passed. JSF ¶ 36. And the notation, entered "on either June 14, 2023 or July 14, 2023," came more than a year after May 26, 2022. JSF ¶ 50. The Court thus concludes that the Defendant violated Section 3322's 5-day and 40-day deadlines.

**2. Harmful Error**

Having concluded that the Defendant committed procedural violations, the Court turns to whether those errors were harmful. The statute invoked by Mr. Heagney provides that an agency's decision "may not be sustained" if the employee "shows *harmful error* in the application of the agency's procedures in arriving at such decision[.]" 5 U.S.C. § 7701(c)(2)(A) (emphasis added). Harmful error is "[e]rror by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error." 5 C.F.R. § 1201.4(r) (2023). And the employee bears the burden to show that the error was harmful. *Id.* In this vein, the Supreme Court has declined to set aside an agency's disciplinary decision merely to penalize the agency for procedural violations when the errors "do not cast doubt upon the reliability of the agency's factfinding or decision." *Cornelius v. Nutt*, 472 U.S. 648, 663 (1985).

At the threshold, Mr. Heagney argues that "[t]he Court already weighed and rejected Defendant's harmless error theory." Opp'n at 20. The Court disagrees. On reconsideration, the Court held only that "ATF's more than six-month delay *plausibly* changed the outcome of its decision by allowing it to respond to the Title VII suit." Mem. Op. at 17, ECF No. 31 (emphasis added). The case is now at the summary judgment stage, so the Court must determine whether, on the developed record, a genuine dispute exists that the delay likely affected the outcome.

Section 3322's deadlines ensure that a former employee learns of an adverse finding and has a full opportunity to respond before a notation is made. *See* 5 U.S.C. § 3322(b). Mr. Heagney

acknowledges that he received notice and had an opportunity to respond. Opp'n at 20. He received all the supporting documentation, obtained extensions to respond, challenged all five proposed findings, and persuaded the deciding official to sustain only three. Opp'n at 20; JSF ¶¶ 36–48. This seems to resolve things. But Mr. Heagney identifies two other harms: (1) that "the delay allowed consideration of his Title VII suit in Texas," and (2) that ATF's use of Section 3322 deprived him of the opportunity for penalty mitigation. Opp'n at 20–21. The Court addresses each in turn.

**a. The Texas Lawsuit**

Mr. Heagney first argues that the missed deadlines were harmful because the delay permitted ATF to consider his August 4, 2022, lawsuit in deciding whether to impose the notation. Opp'n at 20. But as explained above, Mr. Heagney has produced no evidence that could support a reasonable inference that the Texas lawsuit affected the agency's notation decision. *See supra* Part A. The record shows that ATF was already considering the notation before Mr. Heagney filed the suit: it transmitted the report to the Professional Review Board on June 21, 2022, six weeks before Mr. Heagney filed his lawsuit. JSF ¶¶ 32, 52. Furthermore, the Board's Chair testified that he was unaware of the lawsuit when the Board met in September 2022. Coes Dep. at 15:15–21. The deciding official, Mr. Schmidt, likewise testified that Mr. Heagney's EEO activity "had no effect on [him]" and that he never even read the lawsuit. Schmidt Dep. at 50:1–14. To be sure, the delay made it technically possible for ATF to consider the suit, but that does not show that the suit altered the result. Harmful error requires a showing that the error was "likely to have caused" a different outcome, not that a different outcome was possible. 5 C.F.R. § 1201.4(r). For these reasons, Mr. Heagney has failed to proffer evidence from which a reasonable jury could find that the August lawsuit likely influenced the agency's conclusion.

**b. The *Douglas* Factors**

Mr. Heagney next argues that the procedural violation prejudiced him by preventing him from mitigating his penalty under the factors in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981), which govern penalty selection in disciplinary proceedings for current employees. Opp'n at 21. Mr. Heagney's theory runs as follows. If the investigation was resolved on November 19, 2021, and ATF had complied with the 5-day statutory deadline, Mr. Heagney would have been notified by November 24, 2021—nearly 11 months before he was given notice on October 25, 2022. JSF ¶ 36. Compliance with the 5-day deadline, then, would have given Mr. Heagney notice before his retirement in February 2022, JSF ¶ 29, permitting him to mitigate his penalty under the *Douglas* factors. *See* Schmidt Dep. at 12:8–25, 13:1–8 (testifying that the *Douglas* factors would have applied had Mr. Heagney "still been with the Agency when the Agency was ready to charge him," but that under Section 3322 they are "not being used"). Mr. Heagney then points to evidence in the record that could have supported mitigation, including his more than 20 years of service at ATF, a temporary promotion, an award for his group, and favorable performance assessments. JSF ¶¶ 2–6.

Although the Court acknowledges the mitigation evidence and distinct disciplinary procedures for current and retired employees, Mr. Heagney's theory suffers from an intractable flaw: entitlement to the 5-day deadline is mutually exclusive with the ability to mitigate using the *Douglas* factors. As Mr. Heagney acknowledges, the *Douglas* factors do not apply to a notation under Section 3322. Opp'n at 21. Once an adverse finding is sustained, the statute prescribes a notation rather than a choice among lesser penalties. *See* 5 U.S.C. § 3322(a). Section 3322's 5-day and 40-day deadlines govern the process for entering a permanent notation in a *former* employee's personnel file. *See id.* § 3322(a), (b)(1). But Section 3322 applies only to an employee who

"resigns from Government employment prior to the resolution of such investigation," *id.* § 3322(a), and therefore does not impose those deadlines on disciplinary proceedings against a *current* employee. For a current employee facing an adverse action, Section 7513 sets the relevant deadlines. It generally requires "at least 30 days' advance written notice, . . . stating the specific reasons for the proposed action[,]" *id.* § 7513(b)(1), and "a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer[,]" *id.* § 7513(b)(2). Had Mr. Heagney undergone the procedures applicable to current employees, then, he would not have been entitled to Section 3322's 5-day and 40-day deadlines. Missing the 5-day notice deadline therefore could not have deprived him of mitigation under the *Douglas* factors because if the *Douglas* factors applied, Mr. Heagney would not have been entitled to the 5-day deadline. At bottom, Mr. Heagney wants to reap the benefits of the deadlines governing one statutory procedure and the penalty protections available only under another. Mr. Heagney cannot have his cake and eat it too.

For the foregoing reasons, the Government is entitled to summary judgment on Mr. Heagney's harmful procedural error claim based on the 5-day and 40-day deadlines.

* * *

"Title VII requires [courts] to be vigilant in smoking out unlawful motives while remaining 'reluctan[t] to become involved in the micromanagement of everyday employment decisions.'" *Allen v. Johnson,* 795 F.3d 34, 41 (D.C. Cir. 2015) (quoting *Forman v. Small,* 271 F.3d 285, 291 (D.C. Cir. 2001)). Although Mr. Heagney's claims were plausible at the pleading stage, the developed record supplies nothing to sustain them. Mr. Heagney failed to put forward sufficient evidence for a reasonable jury to find that the employer's legitimate, nonretaliatory reason was not the actual reason and that the employer instead acted in reprisal for his Texas lawsuit. And although

the agency flouted the 5-day and 40-day deadlines in Section 3322, the record does not establish that Mr. Heagney is entitled to any form of relief.

## CONCLUSION

For the foregoing reasons, the Court grants the Defendant's Motion for Summary Judgment, ECF No. 59, as to all remaining counts in this lawsuit.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: October 21, 2026